

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-30-2006

# Moore v. City of Philadelphia

Precedential or Non-Precedential: Precedential

Docket No. 03-1465

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Moore v. City of Philadelphia" (2006). *2006 Decisions.* Paper 491.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/491

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL


UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

———

NOS. 03-1465 and 03-1473

———

* MYRNA MOORE; SHEILA YOUNG;
RAYMOND CARNATION; WILLIAM MCKENNA;
RICHARD SAFFORD

v.

CITY OF PHILADELPHIA;
JOHN MARONEY, SGT.; FRANK BACHMEYER, LT.;
WILLIAM COLARULO, CAPT.; CULLEN, LT.;
WILSON, LT.; FRANK HOGAN, LT.; DAVID
HOGAN, LT.; FRANK MACH, SGT.;
JOHN HEWITT, SGT.; JOSEPH JACKSON, SGT.

Raymond Carnation;
William McKenna,
Appellants in No. 03-1465

* (Amended per Clerk's 4/14/03 Order)

———

MICHAEL MCKENNA
Appellant in No. 03-1473

v.

CITY OF PHILADELPHIA; HOGAN, LT.;
CULLEN, LT.; WILSON, LT.; MORONEY, SGT.;
FRANK BACHMEYER, LT.; WILLIAM
COLARULO, CAPT.; JOSEPH O'CONNOR,
INSPECTOR; FRANK MACK; JOSEPH
JACKSON; JOHN HEWITT

On Appeal From the United States
District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action Nos. 99-cv-01163
and 98-cv-05835)
District Judge:  Hon. Mary A. McLaughlin

Argued April 24, 2006

BEFORE:  FUENTES, STAPLETON and
ALARCON,* Circuit Judges

* Hon. Arthur L. Alarcon, Senior United States Circuit Judge
for the Ninth Circuit, sitting by designation.

(Opinion Filed: August 30, 2006)

Elliott Schulder
Gregory M. Lipper (Argued)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004
  Attorneys for Appellants

Romulo L. Diaz, City Solicitor
Elise M. Bruhl, Deputy City Solicitor, Appeals (Argued)
City of Philadelphis Law Department
1515 Arch Street - 17th Floor
Philadelphia, PA  19102-1595
  Attorneys for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Michael McKenna, William McKenna, and Raymond Carnation are all former police officers who worked in the 7-squad of the 25th District of the Philadelphia Police Department.

3

All three officers are white. They claim that their supervisors violated their right under Title VII to be free from retaliation for opposing racial discrimination in the workplace. The District Court granted summary judgment in favor of their employer. Accordingly, in the course of our review, we will view the record in the light most favorable to the plaintiffs. We will reverse as we find that these three police officers have raised triable issues as to whether they suffered unlawful retaliation.

I.

A.     Background

In August 1997, Captain William Colarulo took the helm of the 25th District of the Philadelphia Police Department and assumed command of the 7-squad within that district. At that time, Michael McKenna (hereinafter "Michael") was a beat officer in the 7-squad. In August of 1997, Michael's brother, William McKenna (hereinafter "William") and Raymond Carnation (hereinafter "Carnation") were transferred to the 7-squad from another squad within the 25th District.

When Colarulo assumed control, the 25th District – "the Badlands" – was known for having one of the highest violent crime rates in Philadelphia. To respond to the crime rates in the area, Colarulo set up barricades in certain neighborhoods that required a constant presence of beat officers in the 7-squad. The 7-squad did not have a regular sergeant supervisor at that time.[1]

---

[1] The hierarchy in police departments, in order of rank, is: rank-and-file officers, corporals, sergeant, lieutenants, and

4

Various beat officers took advantage of this lack of supervision by not patrolling their beat properly and failing to man those barricades.

William and Carnation were partners on their beat. From the moment they arrived at the 7-squad in August 1997, the two complained of various forms of harassment by fellow officers – e.g. not getting courtesy rides from other officers, not having access to radios on their shift, other officers interfering with their radio communication . . . etc. Also, William and Carnation interacted with several African-American officers on the 7-squad, answering work-related questions and socializing with them in the office. Apparently, this was not the norm in the 7-squad. One of these African-American officers told William that the other white officers in the 7-squad did not speak with her. William and Carnation also heard complaints about tense race relations at the squad from other black officers.

B.      Maroney's Conduct

In October of 1997, Sergeant John Maroney became the permanent supervisor of the 7-squad. Throughout the fall and winter of 1997, these plaintiffs witnessed numerous incidents that indicated that Maroney would exacerbate the racial discord in the 7-squad.

Michael reported several instances where Maroney made racially derogatory comments about black officers in front of him, each time eliciting an objection from Michael. The District

captains.

5

Court summarized:

> Sometime in October of 1997, [Michael] heard Maroney say "I'm going to get that nigger Safford." [Michael] said, "Please do not use any words like that in my presence. I don't want people to think you are talking to me about something like that." . . .
>
> [Michael], while on duty, approached Myrna Moore, an African-American officer [in the 7-squad] who was . . . standing outside by herself in the rain. She told [Michael] that she had been told to stand at that location. [Michael] told her that she was supposed to be . . . [working with him to patrol] the area in the car, not on foot. . . . [When Sergeant Maroney saw Moore in Michael's car, Maroney asked Michael, not in Moore's presence]: "What's the nigger doing in the car?" [Michael] responded, "Sarge, I told you once before about this. Don't use that in front of me again." Sergeant Maroney told [Michael] that Officer Moore was being punished. [Michael] said "Being punished? Since when does the Police Department punish people by keeping them out in a dangerous area by themselves? She could get killed like that. That's somebody's mom, and not just that, it's somebody's daughter." To which Sergeant Maroney replied, "Well if you don't like it . . . you want to see how it's like to work with a nigger." Maroney then instructed [Michael] to

6

drive the police vehicle back and drop it off . . . [and then Maroney] drove him back to the location where Officer Moore was standing and Maroney told the plaintiff to stand there with Moore and not to move from that location. . . .

At a different time in the fall or winter of 1997, Sergeant Maroney made the comment that "[a female officer] better watch herself, because these niggers around here will kill her." [Michael] told Sergeant Maroney not to use those words. . . .

Also during the fall or winter of 1997, Sergeant Maroney stated, in [Michael's] presence, "why are they hiring these niggers?" . . . [Michael] responded, "Sarge, you know how I am when you talk like that. I'm asking you to stop."

App. at 17-19.

William and Carnation also witnessed incidents that revealed Maroney's attitudes regarding the African-American officers he supervised. Maroney was one of the supervisors in the squad from which William and Carnation had transferred in August 1997. Within a week or two of Maroney taking over the 7-squad in October 1997, William and Carnation relayed numerous grievances regarding their workplace and fellow officers to Maroney. During those initial conversations, they told him about "racial problems" within the 7-squad. After those initial conversations, they heard various complaints from African-American officers about Maroney's conduct as a

7

supervisor. Myrna Moore, a black female officer, told William that she thought that Maroney was "blatantly a racist" and that he assigned her white counterparts to work in the building while she had to work outside in the cold. App. at 298. William relayed that conversation to Maroney in what he later described as an effort to "forewarn" Maroney. Maroney replied that William could "tell that critter to do what she has to do." App. at 193. In another incident, William and Maroney heard an African-American officer's voice on the police radio, to which Maroney commented: "Why do they continue in hiring these niggers? They are stupid as sin." App. at 156. William responded: "I don't appreciate that. You're held to a higher standard than I am." *Id.* Carnation observed Moroney being rude to black officers, not socializing with them as he did with white officers, bragging about "sick checking" one black officer late at night, making jokes about black officers being "stupid" or "slow," and ridiculing a black officer for being hospitalized after choking on a chicken bone. App. at 891-92.

At the same time, other workplace tensions began to develop for the plaintiffs in this case. In late 1997, Michael overheard five or six colleagues in the 7-squad discussing how to get more overtime by having each officer say they were involved in a drug arrest so that each would be called into court. Michael immediately reported this "piling-on" scheme to Maroney and Maroney immediately went into the squad room where the discussion had occurred. Shortly thereafter, Maroney imposed a rule there would be no more than two officers allowed to participate in a drug arrest. A few days after this incident, Michael saw graffiti on the walls of the bathroom that included his name and words like "rat," "asshole," and "snitch."

The word "rat" was written on Michael's time sheets and other paperwork.

At some point after William and Carnation reported the numerous problems they had with fellow officers to Maroney, the other officers began to refer to Carnation and William as "rat" and "snitch" over the radio and make "rat noises" in front of them. In December 1997 or January 1998, the bathroom was covered in graffiti referring to Carnation and William as "rats," "snitches," and "pussies," and noted that the two officers "belong in a rat hole." The words "rat #1" was written on William's January 1998 time sheet.

C.      Complaining About Maroney's Conduct

In October 1997, William and Carnation first raised concerns about racial tensions in the squad to their superiors. In that month, William and Carnation were shot at while on their beat. The suspects were apprehended by other police officers within a minute and a half. Five minutes after the shooting William and Carnation were relieved so that they could give a statement as to what had happened. Their temporary sergeant supervisor recommended commendation for their role in the shooting. Within a week of the shooting, they had a meeting with Captain Colarulo and Lieutenant Frank Bachmeyer to express concern that they did not receive back-up after the shooting quickly because "we felt that it was the blacks were being singled out . . . and because of our association with the black officers, we weren't getting the backup, like, we would have been, if I guess, we didn't associate with them." App. at 274.

In November 1997, William and Carnation slipped a note under Colarulo's door requesting a meeting to discuss why the request for commendation in connection with the shooting had been denied. They requested that Maroney attend the meeting, but he did not do so. William and Carnation discussed with Colarulo various concerns they had about the operation of the 7-squad, including that "there was certain black officer[s] that were having problems with Sergeant Maroney." App. at 629. At that point, they were simply reporting the situation to supervisors.

However, in subsequent meetings with their superiors, all three plaintiffs made clear that they opposed Maroney's expressions about and conduct towards their African-American colleagues and were concerned that their position was being held against them by Maroney. In a December 1997 meeting with Bachmeyer and Maroney, Carnation and William complained – among other things – that Maroney was treating black officers unfairly and that they were being treated in the same manner because they had attempted to resolve problems between Maroney and the black officers.

In late December 1997, Michael also met with Bachmeyer and told him about the situation regarding the graffiti in the bathroom in which he was named as a rat and a snitch and relayed his concern about Maroney's persistent use of the term "nigger" to refer to black officers. Bachmeyer suggested that he report this information to Colarulo. Michael met with Bachmeyer and Colarulo and relayed his concerns about the graffiti and about Maroney's comments regarding the black officers. Among other things, Michael related the incident

10

with Moore in which Maroney ordered him to stand in the rain with Moore because Michael had challenged Maroney's treatment of her. After this discussion, Colarulo took certain actions regarding the graffiti, including ordering the walls painted and threatening that future graffiti would be dealt with through departmental discipline or criminal charges.

On February 5, 1998, Carnation was working outside in the cold. After asking for relief from coworkers and receiving none, he walked away from his post to get something to eat and drink. While he was walking away, Maroney called him on the radio to request his location. When Carnation explained, Maroney ordered him back to his post. After returning to his post for another hour, Carnation told Maroney that he could not handle it any more and went home. The next day, Carnation was told to report to Colarulo's office. Carnation went to the captain's office, where Colarulo, Bachmeyer, and Maroney awaited his arrival:

> [Colarulo] started screaming at me saying that I left my post, and if I keep this behavior up, he's going to transfer me to the farthest district from my house. He can make my life a living nightmare if I make an EEOC complaint. How dare I accuse Sergeant Maroney of being unfair to the black officers and just the whole speil like that. . . .

> [Q: So Captain Colarulo brought up complaints on behalf of black officers?] He said if I make an – because I spoke to him prior to this, and he said: If I make an EEOC – he picked up the phone at the meeting. He said: If I pick up this phone and make an EEOC complaint, he goes, I'll make your life a living nightmare. This is what he's saying to me. And I'm like I don't know what to do. So

11

I kind of broke down a little bit. . . .

[H]e kept telling me to apologize to Sergeant Maroney. I'm like, apologize to Sergeant Maroney[?] Yeah, accusing him of doing something and something. And I'm like: Captain, I said, don't take it from me. Isaid: Talk to your officers downstairs. I said: Talk to Bruce Smith [African-American officer] He wouldn't talk – I said: Ask him. Don't take my advice. . . . And I asked him if I can be transferred. He's like: I'm not transferring you. I'll transfer you to the farthest district when I feel I want to. He was dictating me. Then he's bragging . . . that he could have me where ever he wants me because all he has to do is make a phone call.

App. at 914-15. Carnation described Colarulo as warning "in a loud tone of voice . . . that [Carnation] better have proof that Sgt. Maroney was harassing certain individuals." App. at 833-34. While Maroney remained silent during this meeting, Carnation described Bachmeyer as having "chimed in a little bit just stating that I was wrong and I'm creating trouble and things like that." App. at 915.

D.      Reactions to Complaints

After having initially complained to Maroney, all three plaintiffs reported that their treatment by Maroney worsened. After William and Carnation first confronted Maroney about racial problems in the 7-squad, Carnation recalled that they would not receive lunch breaks and other breaks as other officers would, that Maroney would discuss their personal lives in front of other officers and that "the demeanor towards us was totally different." App. at 891. William noted that Maroney would "keep a close eye on my location" and Carnation's

12

location and that Maroney made derogatory remarks about him. App. at 942. Michael described that he received less desirable work assignments after having confronted Maroney about his use of racial epithets. App. at 1183-84.

After Colarulo threatened Carnation that if he made an EEOC complaint he would make his life a living nightmare on February 6, 1998, each of the plaintiffs had their share of workplace troubles. Within weeks, the McKenna brothers were both transferred from the 7-squad and all three eventually were not employed by the police department.

Early in the morning of February 14, 1998, William was overheard declaring that Maroney "should be shot for what he does to us, and everybody else, and what he says about us, and everybody else." App. at 1312. When William returned to work later that day, his service weapon was immediately confiscated and he was assigned to work in the operations room rather than his normal assignment. Colarulo ordered William to undergo a psychiatric examination and, after an investigation, William received a 30-day suspension as a result of the incident. On February 17, 1998, Colarudo told William that he was being transferred to the 12th District. William immediately requested and received restricted duty. On February 20, 1998, William received a performance evaluation from Maroney in which he received satisfactory ratings in all categories except for "relationship with others, effectiveness in dealing with the public, other employees" where he was deemed unsatisfactory. App. at 962.

In November of 1998, William's restricted duty was cancelled and he was placed on medical leave. He had been on restricted duty status for seven months at that point. The Philadelphia Police Department's policy was to permit only six months of restricted duty. The department also has a policy of performing "sick checks" on officers claiming medical leave in

which a supervisor comes to the home of an officer who is out sick and the officer is required to present himself or herself and sign a form. Between November 1998 and March 1999, the department performed three sick checks of William. He filed this lawsuit in early March 1999. Between March 1999 and May of 1999 the department performed approximately 30 sick checks – one almost every other day. After he failed five sick checks, William was dismissed.

After February 1998, Michael McKenna also did not last long in the 7-squad and also eventually left the police force. As noted above, early in the morning of February 14, 1998, William (Michael's brother) said that Maroney "should be shot." At around 6:45 p.m. that day, Michael heard Maroney threaten that he would "kick [Michael's] ass" and "kick [William's] ass." App. at 1327. Fifteen minutes later, Michael was assaulted by a fellow police officer. Michael's wrist was fractured when he fell in the course of the assault. In mid-February 1998, Michael was transferred to the 19th District, without the 30-days required notice. Colarudo later explained that "[Michael] was detailed out of the 25th District for his safety, the safety of others, and the safety of the public." App. at 1268. The assaulting officer was not transferred from the 7-squad. On February 20, 1998, Moroney gave Michael a performance evaluation in which Michael received satisfactory ratings in all categories except for "relationship with others, effectiveness in dealing with the public, other employees," where he was assessed unsatisfactory. Michael had never before received an unsatisfactory rating in a performance evaluation. In fact, he had received commendations from the department, positive attention in the news media, and numerous positive letters from citizens praising his work as a police officer in the 25th District. Maroney admitted Michael's record of good community relations when he wrote in the evaluation that "though you have good rapport with individuals in your assigned area, you have difficulty getting along with co-workers and your supervisor." App. at

14

1421.

In June 1998, Michael filed a private criminal complaint against the officer that assaulted him, another officer present at the scene, and Maroney.  Police department policy prohibits officers from filing such complaints, instead opting for a system where they are handled internally.  The District Attorney did not prosecute the complaint and the internal affairs division investigated the filing of this complaint in June 1998.  Michael was ultimately discharged by the police force in October of 1999.

Ray Carnation remained at the 7-squad after both McKenna brothers were transferred from the unit.  By mid-February 1998, both William and Michael had been transferred from the squad.  On March 25, 1998, Maroney failed to give Carnation a court notice.  When Carnation brought this to Maroney's attention "he just smiled" and when Carnation brought this incident to Bachmayer's attention, no action was taken.  App. at 834.  On April 10, 1998, Carnation observed Maroney talking to several officers and was told after the meeting to "watch yourself" because Maroney was "out to get you."  App. at 834.

In May 1998, Carnation requested and was granted restricted duty at the Police Academy.  He also filed an internal grievance against Maroney, Bachmeyer, and Colarulo.  In late May 1998, Carnation learned that Colarudo stated under oath in the police board inquiry into the McKenna disciplinary action that Carnation was not aware of problems between William, Carnation and Moroney.  When Carnation confronted Colarulo about the statement "he started yelling at me saying it's none of my business . . . what was said and what was not said."  App. at 916-17.

On Friday of Memorial Day weekend, 1998, Carnation

15

called Moroney several times to discuss this situation. Moroney did not take the call. Rather, Carnation received a return call from Colarulo from his shore house in which Colarulo said: "who the fuck do you think you are calling him and trying to do this and trying to do that." App. at 918. On Saturday, Carnation called Moroney three or four times, and on the last time he spoke with Moroney. After Carnation got off of the call, he called Colarulo at his shore house from the caller identification stored on his phone. On July 10, 1998, Colarulo personally served Carnation with disciplinary papers for the Memorial Day weekend incident. Carnation alleges that these disciplinary papers included two false statements – first, that Carnation admitted to knowing he was not supposed to call Moroney and second, that Carnation threatened another Sergeant that he would take retribution for what happened to the McKennas and to him.

During the summer of 1998, Colarulo also intervened in Carnation's child custody dispute with the mother of his child. The mother of his child said that when she first contacted Colarulo in January of 1998, Colarulo was reluctant to become involved. However, in the summer of 1998, she received "a different response" as "she was welcomed to talk to him, as [Colarulo] indicated to her that he would do anything to help her and her daughter." App. at 990. Colarulo pressed the mother for information about whether Carnation was drinking, did drugs, or had heard of his recent hospitalization.

E.    Litigation

On April 29, 1998, Michael, William, Carnation, and three African-American officers from the 7-squad filed a complaint with the Pennsylvania Human Relations Commission and the EEOC. On November 4, 1998, Michael filed a civil rights lawsuit against the City of Philadelphia and various individual defendants. On March 5, 1999, William and

16

Carnation – along with the three African-American officers – filed a separate lawsuit against the City of Philadelphia and various individual defendants. The City of Philadelphia settled the discrimination claims brought by the three African-American plaintiffs. Following consolidated discovery, the District Court granted summary judgment in favor of the defendants in Michael's lawsuit and William and Carnation's lawsuit.[2]

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291. Where the District Court grants summary judgment, "[o]ur review is plenary, and we view the facts in the light most favorable to" the non-moving party. *Jensen v. Potter*, 435 F.3d 444, 448 (3d Cir. 2006). "If a reasonable jury could find for" the party against whom summary judgment was granted "we must reverse." *Id.*

Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[2]While the plaintiffs' supervisors are before us as appellees, they make no argument in support of the judgment in their favor which is independent of the grounds for affirmance advanced by the City. Accordingly, we will address only issues relating to the Title VII liability of the City.

42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995).

With respect to "protected activity," the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the "participation clause") and those who oppose discrimination made unlawful by Title VII (the "opposition clause"). *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006).   Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an  objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. *Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam) (rejecting retaliation claim where "[n]o reasonable person could have believed that" the underlying incident complained about "violated Title VII's standard" for unlawful discrimination); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (retaliation plaintiff must "act[] under a good faith, reasonable belief that a violation existed").   Moreover, the employee's "opposition" to unlawful discrimination must not be equivocal. *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).

As for the second element of the *prima facie* case, the Supreme Court recently clarified what plaintiffs must show to make out retaliation claims under Title VII.  *See Burlington N. & Sante Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006).  Until recently, we required those claiming unlawful retaliation under Title VII – like those claiming discrimination made unlawful by that provision – to show an "adverse employment action" that "alters the employee's compensation, terms, conditions, or

18

privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) (internal quotation marks omitted). Employees claiming retaliation by workplace harassment, therefore, were required to show retaliatory harassment that was "severe or pervasive enough to create a hostile work environment" that would violate the anti-discrimination provision of Title VII in order to violate Title VII's protection from retaliation. *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006).

In *Burlington Northern*, decided after the District Court's opinion in this case, the Supreme Court disagreed with a formulation like the one we adopted in *Robinson* and *Jensen*. 126 S.Ct. at 2410 (citing *Robinson*, 120 F.3d at 1300, as an example of this standard). It found that the discrimination and retaliation provisions of Title VII have different statutory language and different purposes, and accordingly, "that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-13. Because the discrimination and retaliation provisions "are not coterminous," the Court concluded that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 2414. Consistent with this view, the Court held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415.

To establish the third element of the *prima facie* case, as clarified in *Burlington Northern*, a plaintiff must show a causal connection between the plaintiff's opposition to, or participation

19

in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. "Many may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006). This third element "identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus." *Id.* at 449-50. "The ultimate question in any retaliation case is an intent to retaliate *vel non*." *Id.* at 449 n.2.

If the employee establishes this *prima facie* case of retaliation, the familiar *McDonnell Douglas* approach applies in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997). To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Contrary to the conclusion of the District Court, under this governing law, the fact that the plaintiffs are white is not a "threshold problem" for their retaliation claims. While white workers may be unable to successfully complain under the anti-discrimination provision of Title VII solely because they are required to work in an environment hostile to blacks,[3] if they became the victims of "materially adverse actions" because they

---

[3] *See Childress v. City of Richmond*, 134 F.3d 1205 (4th Cir. 1998) (*en banc*); *see also Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005).

20

reasonably perceived that environment as violative of Title VII and objected, they have a valid retaliation claim. *See* 42 U.S.C. § 2000e-3(a) (making it unlawful to discriminate against an employee who "has opposed any practice made an unlawful employment practice by this subchapter" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"); 2 EEOC Compliance Manual §8, p. 8-2 (1998) *available at* http://www.eeoc.gov/policy/docs/retal.pdf (as visited Aug. 1, 2006) ("A charging party who alleges retaliation under Title VII . . . need not also allege that he was treated differently because of race, religion, sex, national origin, age, or disability."). *See also Burlington N. & Sante Fe Ry. Co.*, 126 S.Ct. at 2412. ("The substantive [anti-discrimination] provision seeks to prevent injury to individuals based on who they are, *i.e.,* their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct."). That is precisely what these plaintiffs claim here. Title VII's whistle-blower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class.

### III.

We will reverse the District Court's grant of summary judgment because we conclude that the plaintiffs have raised genuine issues of material fact about whether the defendants have violated Title VII's anti-retaliation provisions.

A.      Employee Opposition to Unlawful Discrimination

By late-December 1997 there is evidence from which a factfinder could reasonably find that all three plaintiffs had made clear to Maroney, Bachmeyer and Colarulo that they objected to Maroney's remarks and treatment of African-American officers. While the plaintiffs had not yet "participated in" a Title VII proceeding, they had "opposed" unlawful

discrimination by expressing their criticism of their supervisor's conduct to their supervisor and up the chain of command.

"Opposition" to discrimination can take the form of "informal protests of discriminatory employment practices, including making complaints to management." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). To determine if retaliation plaintiffs sufficiently "opposed" discrimination, "we look to the message being conveyed rather than the means of conveyance." *Id.*

Carnation and William complained to Bachmeyer – Maroney's supervisor – in front of Maroney that Maroney was treating black officers less favorably than white officers. They relayed specific stories to evince Maroney's derogatory comments about black officers such as the "critter" comment and complained that they were being treated in the same manner because they had attempted to resolve problems between Maroney and the black officers. In late December 1997, Michael also met with Bachmeyer and later with both Bachmeyer and Colarulo to relay concerns, including concerns about Maroney's treatment of black officers. He, too, relayed specific instances – such as the order to stand outside in the rain with Moore after having challenged Maroney's treatment of her. There was nothing vague or equivocal about the plaintiffs' criticism of Maroney – these plaintiffs opposed Maroney's supervision of the black officers on the squad and they complained both to him and to his supervisors.[4]

---

[4]The defendants argue that these complaints about discrimination were obscured by numerous complaints about various managerial issues unrelated to racial issues. This does not affect our analysis of whether the plaintiffs engaged in protected conduct. Opposition to discrimination does not need to stand separate and apart from any other criticism of

22

Furthermore, the fact that these plaintiffs had made their opposition to unlawful discrimination clear to their superiors was plainly revealed around a month later. We find it difficult to imagine a Title VII plaintiff producing stronger evidence of retaliatory animus than Carnation's account of his conversation with Colarulo on February 6, 1998. On that date, the captain of Carnation's district called him into his office – in the presence of Carnation's sergeant and lieutenant – on an unrelated matter and expressly threatened Carnation with retaliation if he filed an EEOC complaint about Maroney's treatment of black officers. Carnation recalled that Colarulo declared that he would "make my life a living nightmare if I make an EEOC complaint" and asked "How dare I accuse Sergeant Maroney of being unfair to the black officers?" A reasonable factfinder could conclude that Colarulo's comments revealed that the plaintiffs' supervisors viewed the plaintiffs as having allied with black officers, wanted to suppress or undermine any discrimination lawsuits that might arise, and were willing to take action against the plaintiffs for having complained in the first place and in order to keep their complaints from going any further. Given that William and Michael were so closely associated with Carnation, a factfinder could reasonably infer that this threat was not specific to Carnation.[5] Colarulo essentially announced a policy, in front of

management in order to be entitled to protection under the anti-retaliation provision. As discussed *infra*, a factfinder could find that the employer's actions were a response to complaints about racial issues, rather than the other complaints.

[5] It is undisputed that Michael did not make Colarulo's "make your life a living nightmare" statement to Carnation part of the record in his case before the District Court. On appeal, Michael argues that district courts are "entitled to take judicial notice of the facts of [a] decision" in related litigation. *See Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 278 n. 7 (3d Cir. 1999). This proposition does not support his asking this

the supervisors who could carry it out, to silence the voices that had opposed Maroney's conduct. The message was clear – opposition to Maroney's racial discrimination needed to stop, and Colarulo was going to make it stop by silencing these officers rather than by disciplining or removing Maroney.

This conversation is significant to our analysis of both the first and third prong of the *prima facie* case the plaintiffs must satisfy. The conversation makes clear that Colarulo perceived that the plaintiffs had engaged in protected conduct when they had complained about Maroney's treatment of black workers. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 565 (3d Cir.

---

Court to reverse a District Court judgment based on facts not tendered to the District Court. Michael is essentially asking us to reverse the District Court for failing to take judicial notice of facts *sua sponte*. We normally do not consider facts outside of the District Court record, *Clark v. K-Mart Corp.*, 979 F.2d 965, 967 (3d Cir. 1992) (en banc), because the "proper function of a court of appeals is to review the decision below on the basis of the record that was before the district court." *Fassett v. Delta Kappa Epsilon (New York)*, 807 F.2d 1150, 1165 (3d Cir. 1986). In fact, Michael would not have had to employ judicial notice to place this evidence before the District Court. This conversation was produced in consolidated discovery and available for him cite in his opposition to the defendant's motion for summary judgment. He did not do so, and we may not consider this evidence in his appeal.

Given that retaliatory animus is often difficult to prove, omitting this evidence is curious; but we find that it is not fatal. As discussed below, on the evidence in the record, a reasonable jury could conclude that actions taken against Michael were prompted by his opposition to Maroney's discriminatory management without reference to Colarulo's express vow to retaliate.

24

2002) ("[Employee's] perception theory of illegal retaliation – that he was fired because Mercy *thought* that he was engaged in protected activity, even if he actually was not – presents a valid legal claim. . . . [I]t does not matter whether the factual basis for the employer's discriminatory animus was correct and that, so long as the employer's specific intent was discriminatory, the retaliation is actionable."). As discussed below, this evidence would also support a finding that certain actions taken against the plaintiffs were animated by a retaliatory motive rather than some other reason.

We also conclude that the plaintiffs opposed conduct that a reasonable person could believe violated Title VII's standard for unlawful discrimination. As we have noted, retaliation plaintiffs must "act[] under a good faith, reasonable belief that a violation existed." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). However, a victim of retaliation "need not prove the merits of the underlying discrimination complaint" in order to seek redress. *Id.* We need only determine whether a reasonable person in these officers' circumstances could conclude that black officers in the 7-squad were suffering discrimination made unlawful by Title VII.

The treatment of African-American officers in the 7-squad observed by these plaintiffs easily meets this standard. These plaintiffs witnessed their direct supervisor repeatedly use derogatory racial epithets about black police officers. Their supervisor's racial epithets were accompanied with his directly linking his attitudes towards black officers with his managerial decisions – e.g., leaving the black female officer on the street on her own to "punish" her, "sick checking" one black officer late at night, and saying he was "going to get" one black officer. He expressed dismay that other managers did not share his views of black officers and did not manifest those views in their decision-making, asking aloud why his colleagues in management continued to hire black officers since they are "stupid as sin."

25

When the plaintiffs objected to his comments, he did not relent and, in one instance, put Michael in the rain with a black officer Moroney claimed to be punishing after Michael stood up for her so that Michael would "see how it's like to work with a nigger." Maroney, thus, persistently used racially-charged epithets in a manner that would support an inference that he was actively discriminating against black officers in the workplace. In addition, William and Carnation report hearing from black officers themselves that they were mistreated. One African-American officer told William that Maroney was "blatantly a racist" because of the disparate manner in which Maroney assigned shifts to black and white officers and another black officer told Carnation he was "fed up" and "hopeless" about the way Maroney was treating black officers. App. at 298, 613. This case is not comparable to an employee claiming retaliation for having opposed unlawful discrimination by complaining to supervisors about a single instance in which a co-worker made a sexually explicit joke. *See Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam). The evidence of unlawful discrimination in this case is far more substantial.

We do not agree with the District Court's conclusion that, while plaintiffs' evidence would support a finding that their supervisors used racial epithets out of the presence of black officers, it would not support an inference that the black officers themselves experienced discriminatory treatment. In addition to the fact that there is direct evidence of racial discrimination against blacks, as we have explained, we note as well that evidence of unlawful discrimination may be direct or indirect, and may manifest itself in the presence of the victims or behind their backs.[6] As soon as a witness of such conduct reasonably

---

[6] If a white supervisor told white employees that he fired someone because he was black or harassed someone because she was female, it would not matter that this comment was made

26

believes unlawful discrimination has occurred, the anti-retaliatory provisions will protect their opposition to it. They are not required to collect enough evidence of discrimination to put the discrimination case before a jury before they blow the whistle.

B.      Employer Reaction to Opposition to Discrimination

Having found these plaintiffs to have tendered evidence supporting the proposition that they opposed reasonably perceived unlawful discrimination, we now turn to the issues presented by the second and third elements of plaintiffs' *prima facie* case and by the final step in the *McDonnell Douglas* analysis. We must determine – for each individual officer – whether the supervisors in this case reacted to that opposition by taking "materially adverse" actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Sante Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). In evaluating whether actions are materially adverse, we must remain mindful that "it is important to separate significant from trivial harms" because "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id. See also Jensen*, 435 F.3d at 451

---

outside of earshot of the victim or that the employee did not actually witness the firing or the harassment. Contrary to the view of the District Court, racial epithets of which the targets were not aware may very well form the basis for a reasonable belief that discrimination has occurred or was occurring, depending on the circumstances. When offered for the purpose of showing what the employee reasonably believed, the employee's account of the supervisor's statement would not be hearsay. F. R. Evid. 803(3).

27

("[Title VII] does not mandate a happy workplace."). Furthermore, we must "identify what [materially adverse actions] . . . a reasonable jury could link to a retaliatory animus" for each individual officer. *See Jensen*, 435 F.3d at 449-50. Finally, we must determine if the plaintiffs tendered sufficient evidence to overcome the non-retaliatory explanation offered by their employer. *Krouse*, 126 F.3d at 500-01. These determinations depend on the "totality of the circumstances," *Jensen*, 435 F.3d at 452, as "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir. 1990).

1.    William McKenna

A reasonable jury could conclude that William's supervisors took actions against him that might well dissuade a reasonable worker from filing or supporting a charge of discrimination. On February 14, 1998, nine days after Colarulo promised to make Carnation's life a "living nightmare" if he filed an EEOC complaint, William was disciplined for commenting that Maroney "should be shot for what he does to us, and everybody else, and what he says about us, and everybody else." App. at 1312. The plaintiffs insist that William's comment was a casual one not intended literally. The defendants disagree, but we take the facts in the light most favorable to the plaintiffs at this stage in the litigation. A factfinder, we believe, could reasonably conclude that the discipline William received – having his weapon stripped from him, having his duties changed, being ordered to undergo a psychiatric evaluation, receiving a negative performance evaluation, receiving a 30-day suspension, and being transferred from 25th District – was an overreaction and inappropriately severe discipline. Given Colarulo's threat on February 6, 1998,

28

a reasonable jury could further conclude that this inappropriately severe discipline was caused by retaliatory animus.

We also conclude that, while William's supervisors may have had a legitimate non-retaliatory reason for imposing some discipline, the final step of the *McDonnell Douglass* test is satisfied with regard to the disciplinary actions they in fact took against William. Even though disciplining an officer for workplace infractions would normally be a strong legitimate reason to overcome, the unusually strong evidence of retaliatory animus in this case – Colarulo's "living nightmare" threat – would allow a factfinder to reasonably conclude that William's supervisors went beyond legitimate discipline and were actually motivated by retaliatory animus. It would not be unreasonable for a jury to conclude that a supervisor who had explicitly threatened that he planned to quash complaints about racial discrimination might have seized on one of the complainers' first workplace violations and punished this violation more severely than he would have otherwise.

2.      Michael McKenna

We also conclude that Michael has tendered triable issues of fact as to whether his supervisors retaliated against him for his opposition to discrimination. Michael opposed Maroney's treatment of black officers from the moment Maroney arrived in October of 1997 and raised his criticisms to Maroney and to Maroney's supervisors in December 1997. In mid-February 1998, Michael was threatened, assaulted and transferred from the 25th District. There is evidence from which a factfinder could reasonably conclude that this series of events was caused by retaliatory animus.

Prior to the arrival of Maroney, Michael received various commendations and attention for his work as a police officer at the 7-squad. After Maroney's arrival, he lodged complaints to

29

Maroney, Bachmeyer and Colarulo about his co-workers' conduct with regard to the piling-on scheme and the ensuing graffiti and with regard to Maroney's conduct as a supervisor toward black officers. His supervisors responded to the "snitch" graffiti by instituting policies and enforcing them. By contrast, Michael's criticism of Maroney's conduct toward black officers went unaddressed by all of his supervisors. The only reaction from his supervisors was Maroney assigning him to stand in the rain with black officer he was "punishing" so that Michael could "see how it's like to work with a nigger." In addition, Michael claims that Maroney treated him differently than other officers because of his complaints – testimony the factfinder would be entitled to believe. When Michael's brother made his comment on February 14, 1998, that Maroney "should be shot," Michael was swiftly removed from the 25th District. Michael overheard Maroney threaten to "kick [Michael's] ass" and "kick [William's] ass." Fifteen minutes later a fellow officer assaulted him.[7] After this incident, Colarulo transferred Michael from the

---

[7] It is true that a fellow officer assaulted Michael, rather than Mahoney himself. "When coworkers are the perpetrators [of retaliatory harassment], the plaintiff must prove employer liability using traditional agency principles." *Jenson*, 435 F.3d at 452. Plaintiffs often establish liability by showing supervisory negligence – that "management knew or should have known about the harassment, but failed to take prompt and adequate remedial action." *Id.* at 453 (internal quotation marks omitted). For the assault, however, the link here is not so tenuous because there is evidence to suggest that Mahoney openly endorsed the assault to a squad that already deeply disliked the victim and the assault occurred 15 minutes later. A jury could reasonably conclude that Michael's supervisor instigated the assault.

The defendants do not directly question imposing liability for the assault based on Maroney's threat. Instead, they point to

30

25th District for "his safety, the safety of others, and the safety of the public." App. at 1268. The officer who assaulted Michael and the supervisor that threatened him were not removed. In fact, the supervisor that threatened him gave Michael an unsatisfactory performance evaluation for not getting along with his supervisors – the first unsatisfactory evaluation in Michael's career. A reasonable jury could conclude from these facts that the threat, the assault, and the decision to transfer Michael was motivated by a desire to silence Michael's vocal opposition to unlawful discrimination in the 7-squad. So, too, could a factfinder reasonably conclude that Michael's protection served as convenient pretext to silence this critic.

Michael argues that a jury could consider his transfer to be a materially adverse action and we agree. As we have explained, the Supreme Court has now clarified that where unlawful retaliation is claimed, the plaintiff need only show that an action is "materially adverse" in that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Sante Fe Ry. Co.*, 126 S.Ct. at 2415. In *Burlington Northern*, the Court applied this test to find that a reassignment of a worker to a position with the same job description, but with less desirable duties, was a materially adverse action. *Id.* at 2416 ("Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee . . . from bringing discrimination

certain admissions made by Michael as foreclosing imposing liability for the assault or transfer. *See* Br. Appellee at 41, 43. We do not find the statements defendants identify, when read in context and in the light most favorable to Michael, to be conclusive.

charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."). Michael introduced newspaper articles, commendations, and letters from citizens praising his work as a police officer in the 25th District. Maroney recognized Michael's reputation within the community in his evaluation, where he admitted that Michael had established good relations with the individuals in his assigned area. We find that a reasonable jury could conclude that a lateral transfer from the district where a police officer had earned goodwill and built positive relations with the community over time is the kind of action that might dissuade a police officer from making or supporting a charge of unlawful discrimination within his squad.

As in William's case, we find that the evidence of retaliatory animus in this case would allow Michael to overcome non-retaliatory reasons proffered by the defendants for these actions. A jury could well conclude that these actions were more likely than not taken for retaliatory reasons. The evidence of retaliatory animus – without Colarulo's "living nightmare" threat[8] – is not as strong as in William's case. However, the reason offered by Michael's employer for his transfer is also not as strong as in William's case. Colarudo explained that "[Michael] was detailed out of the 25th District for his safety, the safety of others, and the safety of the public." App. at 1268. However, given Maroney's threat "to kick Michael's ass" and the fact that neither the officer who assaulted Michael nor the supervisor who threatened the assault was transferred or otherwise disciplined, a jury could reasonably disbelieve this proffered reason.

C.     Raymond Carnation

---

[8]*See* footnote 5, *infra*.

Raymond Carnation has also produced evidence from which a factfinder could reasonably conclude that his supervisors at the 7-squad engaged in a pattern of harassment against him to retaliate for his opposition to discrimination. Within two weeks of Colarulo's threat to make Carnation's life a living nightmare, Colarulo had separated Carnation from his two allies in the squad – a squad of officers that had previously identified him as a "rat" and "snitch" along with William and Michael. Carnation subsequently recalled numerous incidents of harassment – not receiving a court notice from Maroney without explanation, being told Maroney was "out to get" him. . . . etc. Moreover, the record is susceptible of the interpretation that Carnation was falsely disciplined for attempting to contact his supervisors on Memorial Day weekend and that Colarulo thereafter became involved in Carnation's custody battle with the mother of his child. We believe a reasonable jury might well conclude that this pattern of harassment might dissuade a reasonable worker from bringing or supporting a charge of discrimination. As in William's case, we further find that the unusually strong evidence of retaliatory animus – Colarulo's direct threat to Carnation – would allow a factfinder to conclude that retaliatory animus was more likely than not the motivating reasons for Carnation's supervisor's actions and, thus, that he survives the final step of the *McDonnell Douglas* test.

V.

By finding that each plaintiff has tendered triable issues as to whether they suffered unlawful retaliation, we do not mean to suggest that every action for which the plaintiffs have sought to recover in their lawsuits is actionable under Title VII. These plaintiffs have cast their net wide, including many workplace wrongs for which Title VII may not provide relief. As noted above, "[m]any may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." *Jensen v.*

33

*Potter*, 435 F.3d 444, 449 (3d Cir. 2006). The *prima facie* case serves "to identify what harassment, if any, a reasonable jury could link to a retaliatory animus." *Id.* at 449-50.

A.      Co-worker Harassment

All three plaintiffs sought to recover for harassment visited upon the plaintiffs by co-workers. We agree with the District Court insofar as it held that Title VII does not provide liability for this conduct on this record. An employer may be liable under Title VII for retaliatory harassment perpetrated by an employee's co-workers only if the *prima facie* case is satisfied and if there is a basis for employer liability for the co-worker's conduct. *Jensen*, 435 F.3d at 449. "When coworkers are the perpetrators [of the harassment], the plaintiff must prove employer liability using traditional agency principles." *Id.* at 452. There is such a basis for liability where supervisors "knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action" to stop the abuse. *Id.* at 453.

In this case, the nature of the harassment visited by co-workers on the plaintiffs cannot be reasonably linked to a retaliatory animus; in fact, the timing and the nature of the abuse forecloses this conclusion. The plaintiffs were called "rats" and "snitches." Michael was called these names immediately after he reported the "piling on" scheme to Maroney. William and Carnation were called these names after they relayed numerous complaints about fellow officers to Maroney and supervisors took some actions in response – rationing radios and cars, instructing officers not to interfere with radio traffic, taking action against graffiti . . . etc. Far from supporting an inference that they were being "rats" or "snitches" for allying with African-American officers, the facts of this case depict three officers who were harassed by co-workers because of their perceived allegiance to a racist manager, not their opposition to

34

him. For William and Carnation, the nature of their early complaints also suggests an initial allegiance to Maroney. William described initially "trying to forewarn [Maroney] about" a fellow officer calling him a racist and Carnation described his role in reporting problems to Maroney as a "middle man." App. at 310, 898. Most important, during the period in which they were called "rats" and "snitches," the plaintiffs identify no evidence from which a factfinder could infer that their co-workers were aware that they had complained about racial tensions at the squad or about Maroney's treatment of black officers. This record reveals no link between the actions taken by the plaintiffs' co-workers and the requisite intent to retaliate for opposing discrimination made unlawful by Title VII.

The plaintiffs argue their supervisors retaliated against them by acquiescing in the harassment they were receiving from co-workers; that management's acquiescence was retaliatory, even if the harassment was not. They argue that if "a particular worker has a nervous condition or hearing problem that makes him miserable when exposed to music for extended periods" the employer could be found to retaliate "by exploiting this vulnerability, moving him from a quiet office to one where Muzak plays constantly." *See Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005). We agree that an employer may be liable if management "knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action," *see Jensen*, 435 F.3d at 453, and the satisfaction of the elements of the *prima facie* case permits the inference that management's failure to intervene was caused by retaliatory intent. *Id.* at 449 n.2. But this record does not support a reasonable conclusion that the plaintiffs' supervisors failed to take adequate remedial action in response to the "rat" and "snitch" graffiti and comments. While "[a]n effective remedy – one that stops the harassment – is adequate per se . . . [e]ven if not effective, an employer's remedial

35

measure is nonetheless adequate if 'reasonably calculated' to end the harassment." *Id.* at 453 (internal citations omitted). The defendants list numerous policies that Maroney, Colarulo, and Bachmeyer enacted and enforced to deal with the plaintiffs being described as "rats" and "snitches" by other officers over the radio, on paperwork, and in bathroom graffiti. Br. Appellee at 45. On this record, the supervisors' responses to co-worker abuse identified by the defendants, and not directly disputed by the plaintiffs, appear to be "reasonably calculated to end the harassment" and thus, the supervisors could not be reasonably faulted for failing to protect plaintiffs as a means of retaliating against them.

B.      Pre-December 1997 Conduct:  William and Carnation

For William and Carnation, to the extent that they complain of decisions by their supervisors prior to December 1997, the record reveals no triable issue of fact under Title VII. William and Carnation's complaints prior to December 1997 are not clear enough to sustain a finding that they were "opposing" unlawful discrimination. As earlier noted, "opposition" to unlawful discrimination cannot be equivocal. *See Barber*, 68 F.3d at 702. In their early conversations with supervisors, William and Carnation describe merely reporting the existence of racial problems. William described his first conversations with Maroney as "trying to forewarn him about" a fellow officer calling him a racist. App. at 310. Carnation described their first meetings with Maroney as follows:

> What I said was just that Carla and Bruce feel like
> your not talking to them. They're not getting a
> fair deal. Things like that. We didn't argue. I
> didn't say anything that he's right or wrong. And
> that's basically what it was. I was just trying to
> be the middle man just to resolve this.

36

App. at 898. In October and November of 1997, William and Carnation's reports about racial problems in the squad to Bachmeyer and Colarulo seem similarly neutral. If litigants claim to be retaliated against for having opposed discrimination, they must have stood in opposition to it – not just objectively reported its existence or attempted to serve as an intermediary.[9] While Colarulo's comments are revealing about management's view of the plaintiffs in February of 1998 and perhaps earlier than that, a jury could not reasonably infer that Colarulo formed those opinions when William and Carnation were merely reporting the existence of a problem.

C.      Post-February 1998 Conduct:  William

In addition to the treatment he received from his supervisors at the 7-squad, William also argues that two other actions taken by the Philadelphia Police Department were unlawful retaliation – the cancellation of his restricted duty on November 4, 1998 and the constant sick checks he endured in March through May of 1999. For both, William relies on the timing of these actions as allowing a reasonable jury to infer that they were motivated by retaliatory animus. As of February 17, 1998, William was transferred to another district and there is no evidence that Colarulo continued to play a role in supervising William. A factfinder could not reasonably impute Colarulo's expression of retaliatory intent to the entire police department.[10] Thus, for subsequent actions taken against William to be actionable, there must be an independent basis for the inference

[9] The same cannot be said of Michael, who sparred with Maroney at every turn from the moment Maroney arrived in October of 1997.

[10] To the extent that Michael sought redress for certain actions taken against him after he transferred from the 25th District, we find that the argument fails for similar reasons.

37

of retaliatory animus. To the extent that William relies upon the brevity of the time periods between the protected activity and alleged retaliatory actions to prove causation, *see Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005) ("[W]hen only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn."), he will have to show as well that the decision maker had knowledge of the protected activity, *see Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) ([Plaintiff] demonstrated the causal link between the two by the circumstance that the discharge followed rapidly, only two days later, upon [defendant's] *receipt of notice* of [plaintiff's] EEOC claim.") (emphasis added).

William points out that he was removed from restricted duty on November 4, 1998, the very day that his brother, Michael, filed a civil rights lawsuit against the police department. Filing a civil rights lawsuit is clearly protected conduct under Title VII, and in the circumstances of this case, retaliating against William for Michael's lawsuit might well be actionable.[11] William, however, points to no evidence to show

---

[11] William asks us to "revisit" the holding of *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 568 (3d Cir. 2002) to the extent that the case stands for the proposition that Title VII's anti-retaliation provision does not bar actions taken against the family members of an employee who engages in protected activity. Br. Appellant at 43-44. There is no reason to confront this issue. That case confronted the issue of whether Title VII "make[s] actionable retaliation against someone who has not himself engaged in protected conduct." *Fogleman*, 283 F.3d at 568. In this case, Michael and William are not just brothers. They are co-whistle blowers. They both engaged in protected conduct. Both filed an EEOC complaint together in April – a

that the police department was aware of Michael's lawsuit prior to taking this action. It is not reasonable for a factfinder to infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decision maker was not aware. Nor is it a fair inference that the decision maker that cancelled William's restricted duty was aware of Michael's lawsuit based merely on the filing date.

William also claims that the Police Department retaliated against him by abusively subjecting him to "sick checks" when he was on medical leave. William received three sick checks in his first five months of medical leave. In the two months after he filed his federal lawsuit, he was subjected to over 30 sick checks – approximately one every other day until he was eventually dismissed for failing sick checks. Here, we find that "temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn" by the factfinder. *See Fasold*, 409 F.3d at 190. The defendants do not dispute that the Police Department would have been aware of William's publicized filing of the lawsuit on March 5, 1999. The striking difference in the application of the sick-check policy before and after the date William filed his lawsuit would support an inference that it was caused by retaliatory animus. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) ("[T]he timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). In addition, enforcing the sick check policy so vigorously would allow a jury to conclude that the disparate

---

fact mentioned in Michael's complaint filed on November 4, 1998. William was a likely witness for Michael at trial. We do not need to revisit the holding of *Fogleman* to find that an employer cannot retaliate against one whistle-blower by taking actions against an ally who is blowing the whistle on the same conduct.

39

application of this policy "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Sante Fe Ry. Co.*, 126 S.Ct. at 2415. Finally, the disparate application of this policy is sufficiently suggestive of retaliatory animus, that we find that a factfinder could reasonably disbelieve the government's proffered legitimate, non-retaliatory reason for the sick-checks and reasonably believe that retaliatory animus motivated the disparate application of the sick-check policy.[12]

VI.

These three police officers have sought to recover for a long, unpleasant experience working at the Philadelphia Police Department. We find that a jury might well believe that their supervisors made their lives the "living nightmare" one supervisor promised as payment for opposing unlawful discrimination. It is true enough that only a portion of that nightmare can be attributed to a desire to retaliate against them and that only a portion of their experience is redressable by Title VII. These officers have claimed many wrongs by many foes for many reasons. But this cannot obscure the fact that a jury

---

[12] The defendants offer as a non-retaliatory reason for the sick checks the departmental policy directing that sick checks be made of officers on medical leave. This does not explain the application of this policy – specifically, the sudden increase in regularity of sick checks after William filed his lawsuit. Nor does William's failures of sick checks evince a pattern that may explain this increase. William failed sick checks on 11/9/98, 2/3/99, and 2/4/99. This does not explain why the department would start performing sick checks once every other day starting in March, 1999, soon after William filed his lawsuit. A jury could reasonably disbelieve this proffered explanation.

The defendants also argue that this issue was waived. We disagree. *See App.* at 862-63.

40

might properly conclude that some of those wrongs by some of those foes were intended to silence the plaintiffs from identifying and opposing unlawful discrimination in the Philadelphia Police Department. Because these plaintiffs have shown genuine issues of material fact as to whether they suffered retaliation made unlawful by Title VII, we will reverse the District Court's blanket grant of summary judgment and remand for proceedings consistent with this opinion.