# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3067

_____

Todd E. Lindeman

*Plaintiff - Appellant*

v.

Saint Luke's Hospital of Kansas City

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 11, 2018
Filed: August 9, 2018

_____

Before COLLOTON, SHEPHERD, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Over eight years, Todd Lindeman worked in a number of positions for St. Luke's Hospital of Kansas City. Though much of that time was uneventful, he quickly progressed through the stages of St. Luke's disciplinary policy from January to April 2014. After his fourth infraction, Lindeman was terminated. Thereafter, he sued St. Luke's, alleging discrimination in violation of the Americans with Disabilities Act (ADA) and Age Discrimination in Employment Act (ADEA). St.

Luke's filed a motion for summary judgment, which the district court[1] granted. Lindeman appeals, and we affirm.

## I.

Lindeman began working for St. Luke's in 2006 when he was 40 years old. Although he enjoyed a good employment record for much of his tenure, this changed when Todd Isbell and Rosa Parodi became his supervisors at some point in 2013. According to Lindeman—who suffers from obsessive compulsive disorder, attention deficit disorder, bipolar disorder, and other physical limitations—Isbell and Parodi were much more demanding, and much less pleasant to work with, than his previous supervisor, Lorra Embers.[2]

St. Luke's has a progressive discipline system under which an employee receives a verbal warning for the first infraction, a written warning for a second infraction, a suspension or second written warning for a third infraction, and termination for any subsequent infraction. Further, the hospital has clear rules prohibiting the dissemination of confidential patient information, including patient names. When he began his employment at St. Luke's, Lindeman received copies of these policies, and the hospital also periodically conducted additional training sessions on patient confidentiality.

On January 1, 2014, Lindeman received a verbal warning after he became argumentative when receiving coaching for failing to answer or return a supervisor's

---

[1]The Honorable Stephen R. Bough, United States District Judge for the Western District of Missouri.

[2]Lindeman alleges that Isbell and Parodi made statements to Lindeman such as "I better see the whites of your eyes or else" and "I'll match your ADD with my ADD and I will win."

phone calls. Later that month, Lindeman received a written warning for failing to abide by the hospital's timecard and call-in procedures at least five times in two weeks. In late February, Lindeman received a temporary suspension for failing to call in prior to missing a scheduled shift. Finally, in April 2014, Lindeman mentioned the name of a patient to a number of individuals inside and outside of the St. Luke's facility, which violated the hospital's confidentiality policies. This fourth infraction qualified him for termination, which occurred on April 25, 2014.

Lindeman then brought this suit against St. Luke's, asserting claims under the ADA and ADEA. After discovery, St. Luke's moved for summary judgment, and the district court granted the motion. Lindeman appeals.

## II.

Lindeman asserts that the district court erred in granting St. Luke's motion for summary judgment. We "review[] de novo a grant of summary judgment," Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc), "viewing the evidence and drawing all reasonable inferences in the light most favorable to [Lindeman], the nonmoving party." Kirkeberg v. Canadian Pac. Ry., 619 F.3d 898, 903 (8th Cir. 2010). We will affirm if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Specifically, Lindeman argues on appeal that he has shown that St. Luke's reason for his termination is pretext for intentional disability discrimination[3] and that he exhausted his administrative remedies on his failure-to-accommodate claim. We address each in turn.

---

[3]In its opening brief, St. Luke's asserts that Lindeman waived his ADEA claim by not mentioning it in his opening brief. Even assuming that Lindeman properly presented the ADEA claim on appeal, his allegation of pretext under the ADEA fails for the same reasons that his comparable claim under the ADA is insufficient.

A.

The ADA prohibits discrimination "on the basis of disability."  42 U.S.C. § 12112(a).  When presented only with circumstantial evidence, we analyze ADA claims under the familiar McDonnell Douglas burden-shifting analysis.  EEOC v. Prod. Fabricators, Inc., 763 F.3d 963, 969 (8th Cir. 2014).  To survive a motion for summary judgment under this analysis, the employee has "the initial burden of proving a prima facie case of discrimination."  McNary v. Schreiber Foods, Inc., 535 F.3d 765, 768 (8th Cir. 2008) (internal quotation marks omitted).  The burden then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the adverse employment action."  Id. (internal quotation marks omitted).  Finally, "the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination."  Prod. Fabricators, 763 F.3d at 969.  Here, on summary judgment and on appeal, the parties have assumed that Lindeman can establish his prima facie case.  Further, St. Luke's proffered reason for Lindeman's termination—disclosure of confidential information in violation of hospital policies—is a legitimate, nondiscriminatory reason for the adverse employment action.  See Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006) ("We have consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee.").  Our focus is therefore limited to whether Lindeman has shown that St. Luke's reason is pretextual.

In order to do so, Lindeman "must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason."  McNary, 535 F.3d at 769 (internal quotation marks omitted).  To meet this burden, Lindeman relies on two types of evidence: First, he claims that other employees also disclosed the name of the patient and received no discipline.  Second, he argues that his history of positive performance followed by his quick progression through the disciplinary policy demonstrates that an unlawful reason actually motivated his termination.

Pretext may be demonstrated by showing disparate punishment between similarly situated employees, but Lindeman must show that he and the alleged comparators "were similarly situated in all relevant respects." Ryan v. Capital Contractors, Inc., 679 F.3d 772, 777 (8th Cir. 2012) (internal quotation marks omitted). This is "a rigorous standard at the pretext stage." Torgerson, 643 F.3d at 1051 (internal quotation marks omitted). To be similarly situated, a plaintiff must show that he and the more leniently treated employees have "comparable disciplinary histor[ies]." Forrest v. Kraft Foods, Inc., 285 F.3d 688, 692 (8th Cir. 2002). And the employees also "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Prod. Fabricators, 763 F.3d at 970 (internal quotation marks omitted). Lindeman asserts that two other employees also revealed the name of the patient but were not disciplined in any way. However, Lindeman points to no evidence that those two individuals were also at the last stage of the progressive disciplinary policy, thereby warranting termination for an additional violation. This is fatal to his argument. See Forrest, 285 F.3d at 692. Additionally, Lindeman concedes that he mentioned the patient's name after being expressly told that doing so was a violation of St. Luke's policies, and there is no evidence that the other employees engaged in a similar course of conduct. See Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 956 (8th Cir. 2012) ("[T]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." (internal quotation marks omitted)). Lindeman has therefore failed to show that he is similarly situated to the purported comparators.

Lindeman next points to his history of positive performance, which he claims is demonstrated by a review from Embers, his former supervisor, given on April 11, 2013. According to Lindeman, this review shows that the reason St. Luke's offered for his termination was pretext because he had favorable performance reviews until Parodi and Isbell became his supervisors, at which point those individuals intentionally began disciplining Lindeman due to his disabilities. In support of this

argument, Lindeman relies on authority from the Tenth Circuit, and he asserts that "[e]vidence of consistent, long-term good performance, followed closely by a series of adverse disciplinary actions is evidence of pretext." Appellant's Br. 25 (citing Greene v. Safeway Stores, Inc., 98 F.3d 554 (10th Cir. 1996)).[4]

There are a number of flaws in this argument. First, in this circuit, "[e]vidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination." Guimaraes v. SuperValu, Inc., 674 F.3d 962, 975 (8th Cir. 2012) (internal quotation marks omitted). Thus, even were we to conclude that one favorable performance review established that Lindeman had a "strong employment history," this would be insufficient to show pretext. Id. Second, the Tenth Circuit case is clearly distinguishable because, there, the plaintiff's performance reviews were made by the same supervisor. Woods, 355 F. App'x at 210. It is therefore understandable why this could serve as evidence of pretext because a single supervisor changing his rating of an employee after a protected activity, without sufficient explanation, suggests the possibility of a discriminatory motive. Here, as stated, we are dealing with different supervisors, so any potential inference of discrimination is weakened substantially by another rational explanation for the change—the shifting expectations of different supervisors. Cf. Tate v. Weyerhaeuser Co., 723 F.2d 598, 606 (8th Cir. 1983) (stating in a Title VII case that a change in supervisors can "suggest[] a basis other than racial [discrimination] for the difference in the treatment"). Finally, apart from being compiled by a different supervisor, the favorable review Lindeman relies on was made nearly one year prior to his violation of the confidentiality rules, and "[a] review issued without that knowledge is irrelevant to whether" Lindeman was actually terminated for the given reason. Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002).

---

[4]Though he represents that he is relying on Greene, Lindeman's quoted material actually comes from that circuit's unpublished opinion in Woods v. Boeing Co., 355 F. App'x 206, 210 (10th Cir. 2009).

Lindeman also briefly asserts that he did not actually violate the confidentiality rules because the patient had already announced her hospitalization via social media, thus waiving any confidentiality. But this argument "misses the mark" because, at best, it "shows only that the employer's belief was mistaken." Liles v. C.S. McCrossan, Inc., 851 F.3d 810, 822 (8th Cir. 2017) (internal quotation marks omitted); accord McNary, 535 F.3d at 770 ("Whether they were correct in their surmise that McNary breached company policy is not the issue."). Instead, Lindeman needed to show that St. Luke's did not honestly believe that he had violated its confidentiality rules. See Liles, 851 F.3d at 822. He has not.

Lindeman has failed to show that St. Luke's reason for his termination was pretext for unlawful discrimination. Accordingly, the district court properly granted summary judgment to St. Luke's on Lindeman's discrimination claim under the ADA.

B.

We now turn to the issue of whether Lindeman exhausted his administrative remedies on his failure-to-accommodate claim. In drafting the ADA, Congress adopted the administrative procedures specified by Title VII. See 42 U.S.C. § 12117(a) ("The powers, remedies, and procedures set forth in [Title VII] shall be the powers, remedies, and procedures this subchapter provides to . . . any person alleging discrimination on the basis of disability in violation of any provision of this chapter . . . ."). Under Title VII, a plaintiff must first exhaust his administrative remedies before filing suit in federal court. Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994). "A plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before the EEOC." Id. Lindeman conceded before the district court that "his Charge of Discrimination does not include any allegation about needing or requesting an

accommodation." As a result, he failed to exhaust his administrative remedies on that claim, and he cannot pursue it in federal court.

## III.

For the foregoing reasons, we affirm the district court.

_____