# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-3648

_____

Timothy Couch

*Plaintiff - Appellant*

v.

American Bottling Company, doing business as Dr. Pepper Snapple Group, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: December 12, 2019
Filed: April 16, 2020

_____

Before LOKEN, GRASZ, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

The American Bottling Company, more commonly known as Dr. Pepper, fired Timothy Couch after giving him a negative performance review. Couch claims that Dr. Pepper retaliated against him for complaining about racial discrimination at

the company.  At the district court,[1] summary judgment was the end of the road for his claims.  We affirm.

I.

Couch was with Dr. Pepper for 17 years.  For most of this time, he received positive reviews from his supervisors, so much so that he became the plant's "operations manager" in 2015.

The following year, his supervisor changed.  At first, Ken Verhulst, a Dr. Pepper executive, ran the plant on an interim basis.  Not long after, he hired Roger Marin to take over the position permanently.  Both Verhulst and Marin tried to implement new management philosophies.

Couch reportedly struggled with the changes.  According to Verhulst, he acted as though he did not want to be "part of the management team," became "combative" in several meetings, and responded to coaching by being "defensive."  Marin added that he did not "think broadly," "understand the business," or "come up with" solutions to problems.

Couch's relationship with Marin deteriorated further after they met to discuss an internal investigation.  The investigation involved Couch's wife, who also worked at the plant.  Another employee had alleged that Couch had displayed favoritism toward his wife, who is Hispanic, by resolving a workplace dispute in her favor.  Couch, believing that the matter had already been cleared up, refused to discuss it and asked Marin why he had mentioned it.  It is not entirely clear why, but Marin then reportedly said that Couch had better not accuse him of discrimination or else their working relationship would suffer.  Interpreting Marin's response as

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

"threatening," Couch filed a charge of discrimination with both the United States Equal Employment Opportunity and Iowa Civil Rights Commissions.

A few weeks later, Marin gave Couch his annual interim performance review. Accompanied by a written report, the interim review, which usually happens in August, lets employees know "where they stand" and how they can improve their performance by year's end. Couch did not do well, earning an overall "[u]nsatisfactory" score of just 2 out of 5. His supervisors had "[s]erious [c]oncerns" about his leadership and asked him to "significant[ly] change [his] behavior."

Couch became "emotional" during what was his lowest-ever review at Dr. Pepper. Disappointment turned into anger, and he told Marin that he "could go ahead and stop because it was all BS" and that he was "now a part of" a plan "to replace" him with one of Verhulst's "[W]est [P]oint budd[ies]." Couch left, and not long after, Dr. Pepper suspended and then fired him.

Couch brought a lawsuit alleging that Dr. Pepper's actions were retaliatory under Title VII and the Iowa Civil Rights Act. His theory is that, once the company discovered that he had filed a charge of discrimination, it got rid of him. The district court dismissed both claims at summary judgment.

II.

We review the district court's decision to grant summary judgment de novo. *See Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1017 (8th Cir. 2011). "Summary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008) (citation omitted).

A.

Couch's theory is the same for both of his claims: Dr. Pepper gave him a negative performance review, suspended him, and ultimately fired him for filing a formal charge of discrimination against the company. *See* 42 U.S.C. § 2000e-3(a) (prohibiting an employer from engaging in discrimination "because [an employee] . . . has made a charge . . . under [Title VII]"); Iowa Code § 216.11(2) (prohibiting an employer from engaging in discrimination "because [an employee] . . . has filed a complaint . . . under [the Iowa Civil Rights Act]"). For this reason, we can evaluate both claims under the same analytical framework. *See Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1147 (8th Cir. 2008) (applying a Title-VII-driven framework to Iowa retaliation claims); *accord Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 585 (Iowa 2017) ("[T]he [Iowa Civil Rights Act]'s retaliation provision was enacted after Title VII and closely tracked the federal provision." (emphasis omitted)).

Couch has no direct evidence of retaliation,[2] so the framework for this case comes from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (Title VII); *Van Horn*, 526 F.3d at 1147–48 (Iowa Civil Rights Act). Even if we assume that Couch has established a prima-facie case under the first step of *McDonnell Douglas*, at step two Dr. Pepper has a chance to provide legitimate nondiscriminatory reasons for its actions. *See Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013) (listing the elements of a prima-

---

[2]Couch asserts that he has direct evidence but then fails to specify any. *See* Fed. R. App. P. 28(a)(8)(A) (explaining that the argument section of the brief "must contain . . . citations to the . . . parts of the record on which the appellant relies"). We will not comb through the record to build his direct-evidence argument for him. *See United States v. Golliher*, 820 F.3d 979, 984 (8th Cir. 2016). That is his job, not ours.

facie case); *Haskenhoff*, 897 N.W.2d at 582 (same).  For Dr. Pepper, the reasons all came down to Couch's performance: an inability to adjust to new management expectations, an unwillingness to be coached, and a refusal to sit through his interim performance review.[3]

The burden then shifts back to Couch at *McDonnell Douglas*'s third step: were these reasons just an attempt to hide Dr. Pepper's retaliatory motive?  *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc); *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 8–9 (Iowa 2009).  Couch would have us say yes based on two categories of evidence, but neither is as helpful as he suggests.

The first is timing.  Dr. Pepper gave Couch his first-ever negative performance review just three days after receiving his EEOC complaint, waited only 15 days to suspend him, and then fired him after just 15 more days had passed.  The short turnaround between Couch's filing of the charge and these disciplinary actions might look suspicious, but generally speaking, timing alone is not enough to establish pretext, *EEOC v. Kohler Co.*, 335 F.3d 766, 773 n.7 (8th Cir. 2003); *Deboom*, 772 N.W.2d at 8, even if it can "create an inference of retaliation" at step one.  *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 738 (8th Cir. 2013) (citation omitted).

In fact, any inference that might be drawn from timing is especially weak here.  After all, Couch knew that his interim review would happen in August and filed his charge at the end of July.  *See Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 742

---

[3]To the extent that Couch argues that his interim review qualifies as an adverse employment action on its own, we disagree.  A negative review generally does not rise to the level of a materially adverse employment action.  *Rebouche v. Deere & Co.*, 786 F.3d 1083, 1088 (8th Cir. 2015); *Haskenhoff*, 897 N.W.2d at 589 (quoting *Rebouche*, 786 F.3d at 1088).  "[E]specially" not here, when the review was an interim one, because it "would not[, by itself,] impact [Couch's] salary or job status." *Haskenhoff*, 897 N.W.2d at 589 (citation omitted); *accord Jackman*, 728 F.3d at 804–05 (explaining that this kind of "papering" does not amount to an adverse employment action on its own because it has no "tangible" effect on pay or other "working conditions" (citation omitted)).

(8th Cir. 2017) (explaining that close timing is less meaningful when a plaintiff could have anticipated an adverse employment action). It was also Marin's first review of Couch, so "any potential inference of discrimination" from the uncharacteristically negative review is "weakened substantially by another rational explanation[:] . . . the shifting expectations of [a] different supervisor[]." *Lindeman v. St. Luke's Hosp. of Kan. City*, 899 F.3d 603, 607 (8th Cir. 2018).

The second category of evidence comes from Marin's post-meeting actions. Following the meeting, he reported to human resources how Couch had reacted, which set off a flurry of emails. Couch seems to believe that by telling someone without supervisory authority over him about what he had done, Marin was looking for someone to help him cover up his retaliatory actions. *See Donathan*, 861 F.3d at 738–39, 741 (noting that it was suspicious to involve a non-supervisor who could have been involved in "hid[ing] a retaliatory motive").

What Couch forgets, however, is that he hurled some serious accusations against Dr. Pepper during his meeting with Marin, including calling it the "most racist company around" and alleging that a Dr. Pepper executive was engaged in favoritism in making personnel decisions. It is hardly surprising that Marin turned around and reported these allegations to the human-resources department for investigation. There is nothing to suggest that it or Marin were up to anything more sinister, much less that some sort of cover-up was afoot. *Cf. id.* Besides, nothing Couch said at his meeting with Marin or in his charge "immunize[s]" either his poor performance or his "insubordination" at the meeting. *Hulme v. Barrett*, 480 N.W.2d 40, 43 (Iowa 1992) (citing *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1391 (8th Cir. 1988)); *see also Jackson*, 840 F.2d at 1391 ("Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct . . . .").

The bottom line is that Couch's evidence falls short of creating a jury issue on pretext. So summary judgment is indeed the end of the road for both of his claims.

## B.

Couch believes that recent Iowa Supreme Court decisions create a pathway past summary judgment for his Iowa retaliation claim. One of them, *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261 (Iowa 2019), recognized a looser standard of causation for retaliation claims. Rather than requiring retaliatory motive to be the "determinative factor" in any adverse employment action, *Van Horn*, 526 F.3d at 1149, all that is required now is that it be a "motivating factor." *Hawkins*, 929 N.W.2d at 271–72 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). Couch says that this development has sounded the death knell for the *McDonnell Douglas* framework in Iowa. *See Hedlund v. State*, 930 N.W.2d 707, 727–37 (Iowa 2019) (Appel, J., concurring in part and dissenting in part) (arguing that the motivating-factor standard is inconsistent with *McDonnell Douglas*).

Couch is asking us to take this analysis several steps further than Iowa courts have. Although it is true that they do not use *McDonnell Douglas* at *trial* in mixed-motive cases anymore, *see Hawkins*, 929 N.W.2d at 272, the majority opinion in *Hedlund* clarified that neither case "disturb[ed]" its "prior law" on "summary judgment." *Hedlund*, 930 N.W.2d at 719 n.8. We trust that the Iowa Supreme Court meant what it said.

There is also nothing in these decisions that relieves Couch of his burden to show pretext. In *Hedlund*, the Iowa Supreme Court made clear that, at summary judgment, the motivating-factor standard does *not* apply in indirect-evidence cases. *See id.* at 719–20 (requiring a plaintiff in an indirect-evidence case to show that discrimination "had a determinative influence on the outcome" (citation omitted)). Couch's case falls squarely into that category, so he must still show that Dr. Pepper's retaliatory motive was "*the* real reason" for its actions. *Id.* at 723 (emphasis added). On this point, for the reasons stated above, his evidence falls short.

## III.

We accordingly affirm the judgment of the district court.

_____