**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2764
_____

IRENE LAURORA,
Appellant

v.

BAYER CORP; JOHN O'MULLANE, in his individual and professional capacities;
BAYER HEALTHCARE HOLDINGS LLC
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Civ. No. 2:16-cv-09041)
District Judge: Honorable Esther Salas
_____

Submitted on July 14, 2022
_____

Before: GREENAWAY, JR., MATEY, and NYGAARD, *Circuit Judges*,

(Opinion Filed: September 7, 2022)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

GREENAWAY, JR., *Circuit Judge*.

Dr. Irene Laurora ("Appellant") commenced this retaliation action against Bayer Corp., Bayer Healthcare Holdings LLC (together "Bayer") and Dr. John O'Mullane (collectively, the "Appellees"). She alleges that Bayer retaliated against her after she objected to Dr. O'Mullane's purported discrimination against another female employee. We will affirm the District Court's grant of summary judgment in favor of Appellees. Dr. Laurora has failed to establish direct evidence of retaliation since the statements she relies on are ambiguous. Additionally, she has failed to offer circumstantial evidence of retaliation because she did not set forth sufficient evidence to establish pretext.

## I.    BACKGROUND

### A.    Factual History

Dr. Laurora joined Bayer as the Vice President, Global Medical Affairs, Analgesics, Cough, Cold and New Products in October of 2007. She remained in this position until July of 2013. She then served as the Head of U.S. Medical Affairs from August 2013 to January 2015. Thereafter, Dr. Laurora was selected to serve as the Vice President/Category Leader for Analgesics, Cough, Cold, Cardio, and Foot Care, a newly created position. In this role, Dr. Laurora was one of five Category Leaders who reported to Dr. O'Mullane, who served as Bayer's Head of Innovation & Development. Shortly after starting this role, Dr. Laurora's team began working with TTP, a third party, to develop a new nasal delivery system for one of Bayer's products (the "TTP Project"). Dr. Laurora tasked one of her direct reports, Margaret Gryszkiewicz, with spearheading the TTP Project.

2

On May 8, 2015, during a meeting between Dr. O'Mullane, Dr. Laurora, Gryszkiewicz, and Simon Gilburt (a Bayer employee who worked in the Allergy division), Dr. O'Mullane inquired about who was leading the TTP Project. After Gryszkiewicz, who was pregnant at the time, replied that it was she, Dr. Laurora recalls Dr. O'Mullane stated "[s]omething along the lines of Margaret, I don't see how you can be the project champion because of your impending family event." JA1429. It was ultimately decided that Gilburt would lead the TTP project.

The following day, Dr. Laurora sent Dr. O'Mullane an email objecting to Dr. O'Mullane's comments about Gryszkiewicz's condition. Specifically, she stated:

> Dear John
>
> I feel compelled to share my feelings regarding the treatment of Margaret yesterday. In no uncertain terms Margaret was told that she could not be a project "champion"[1] because of her pending maturity [sic] leave. Meanwhile this is a project that has been going on for almost two years and has at least a 2 to 3 year program ahead, 3 months would not be a problem for someone (either me or Simon) to cover.
>
> After your initial feedback from your meeting with TPP she and I discussed that she would champion the project and she has been working closely with her business partner. However[,] we both felt it was most appropriate to be Bayer's champion not TPP's champion.
>
> The project was transferred to us in March. Margaret has been working hard to move the project forward since then. I feel that the way the meeting took place was very inappropriate and disrespectful of Margaret.
>
> I felt I needed to tell you.
>
> Irene

JA764-65.

---

[1] At Bayer, the term "Project Champion" referred to the individual tasked with leading a particular project.

The next day, Dr. O'Mullane sent this reply:

> Hi Irene
>
> I appreciate your candid feedback – it's something you and I must discuss further. I don't believe this is the way to develop trust and integrity in our relationship. Confronted with the same situation my approach would have been to discuss this with my leader and then take a revised recommendation back to the person impacted if a change of direction was agreed as the result of that discussion. Acting in the way that you did sets a tone that you have the final decision in this matter . . . . .
>
> I would have made the same decision for anybody knowing that they were about to take a significant planned absence. This was not intended to be disrespectful of Margaret but frankly the opposite of wanting to be respectful to her at a time when we need to have somebody fulfil this role who is present at this very critical time. I don't see how Margaret can do that but I am prepared to discuss further if you have a different POV.
>
> John

JA765-66.

Following this email correspondence, Dr. Laurora alleges that Dr. O'Mullane retaliated against her. As relevant here, she alleges that he: (1) gave her a negative rating for her 2015 performance review; (2) denied her the Rx-OTC Switch Science position; (3) eliminated her role; and (4) failed to find her a new role after hers was eliminated.

Specifically, within Dr. Laurora's 2015 performance review, Dr. O'Mullane gave her a Partially Meets Expectations rating within the subcategory of Leadership. He stated:

> Irene's style is one of leading from the front, which in many situations is great and in other situations such as the Category role does not always work to her advantage. Her style of Leadership needs to be moderated for her to truly [be] successful in this role. I would suggest some reflection on how to create an environment of abundance and looking for strong win-win situations where she can demonstrate her ability to truly lead an organization.

4

JA783.  In response to this comment, Dr. Laurora wrote:

> [s]ince this Category Leadership role is new (to the organization and to me personally) I have appreciated feedback from others and spent time reflecting on the way I work. I will actively incorporate changes to my leadership style as a result.

*Id.*

In addition, the Vice President of Rx-to-OTC Switch Science role that Dr. Laurora was denied was initially given to an employee (Kristie Licata) on the commercial side of business on an interim basis even though Dr. Laurora had relevant prior experience. Ultimately, Bayer merged the Vice President of Rx-to-OTC with that employee's existing commercial role.

Following Bayer's restructuring, Bayer eliminated all of the Category Leader roles that reported to Dr. O'Mullane, including Dr. Laurora's.  Dr. Laurora was subsequently denied other positions at her level (including Head of Therapeutics and Head of Innovation and Development Operations).  Because she did not find an alternative role at her level or with the same total compensation, her employment with Bayer terminated on September 30, 2016.

## B.    Procedural History

Appellant commenced this action on December 7, 2016.  On August 13, 2018, she filed an amended complaint, alleging retaliation claims under the Family Medical Leave Act ("FMLA"), the New Jersey Law Against Discrimination ("NJLAD"), and Title VII of the Civil Rights Act of 1964 ("Title VII").  Thereafter, on February 13, 2019, Appellees filed a motion for summary judgment, which the District Court granted.  The

5

District Court concluded that Appellant failed to establish direct evidence of retaliation. The District Court likewise concluded that she failed to establish circumstantial evidence of retaliation because she did not establish a *prima facie* case. Appellant timely appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332 and supplemental jurisdiction over Plaintiff's NJLAD claims pursuant to 28 U.S.C. § 1367(a). We have jurisdiction pursuant to 28 U.S.C. § 1291.

We conduct a plenary review of a district court's grant of summary judgment. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We draw all reasonable inferences from the record in favor of the nonmoving party. *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 209 (3d Cir. 2005).

## III. DISCUSSION

Pursuant to the FMLA, an employee is entitled to take 12 workweeks of leave due to the birth of a child. 29 U.S.C. § 2612(a)(1). The FMLA protects this right by prohibiting employers from: (1) "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" rights provided under the statute, 29 U.S.C. § 2615(a)(1); and (2) "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful," 29 U.S.C. § 2615(a)(2).

Likewise, Title VII prohibits employers from discriminating against employees on the basis of sex. 42 U.S.C. § 2000e-2(a). This prohibition is breached "whenever an

6

employee's pregnancy is a motivating factor for the employer's adverse employment decision." *In re: Carnegie Ctr. Assoc.*, 129 F.3d 290, 294 (3d Cir. 1997) (internal quotation marks and citation omitted); *see also Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir.), *order clarified,* 543 F.3d 178 (3d Cir. 2008). Title VII also "makes it unlawful for an employer to retaliate against an employee 'because he has opposed any practice made an unlawful employment practice by this subchapter . . . .'" *Kengerski v. Harper*, 6 F.4th 531, 536 (3d Cir. 2021) (quoting 42 U.S.C. § 2000e-3(a)).

Lastly, the NJLAD prohibits employers from discriminating against employees on the basis of pregnancy. N.J. Stat. Ann. § 10:5-12(a). "The LAD is violated not only when an individual of a protected class is discriminated against, but also when reprisal is taken against any person who opposed such actions or practices forbidden by the LAD . . . ." *Rodriguez v. Raymours Furniture Co.*, 138 A.3d 528, 535 (2016) (citing N.J. Stat. Ann. §§ 10:5-12(d)).

Retaliation claims under the FMLA, Title VII and the NJLAD are assessed through the same evidentiary framework. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012) ("Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law."); *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007) (citing *Andersen v. Exxon Co., U.S.A.*, 446 A.2d 486, 490 (1982)) ("In applying the LAD, the New Jersey anti-discrimination law, courts use the same burden-shifting framework that the Supreme Court adopted in *McDonnell Douglas* . . . ."). Under each of these statutes, a plaintiff can establish retaliation in two ways: direct

7

evidence and circumstantial evidence. *See Lichtenstein*, 691 F.3d at 301–02. Here, Appellant brings her retaliation claims under both theories. We will address each in turn.

A. **Direct Evidence**

Evidence constitutes direct evidence of retaliation if "it demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997) (internal quotation marks and citation omitted). "Such evidence leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it when he made the challenged employment decision." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (internal quotation marks and citation omitted). If a plaintiff produces direct evidence, "the defendant [then] has the burden of producing evidence to show that it would have made the same decision in the absence of discriminatory [or retaliatory] animus." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010).

We have specified that for evidence to be considered direct evidence it: (1) "must be strong enough to permit the factfinder to infer that a discriminatory [or retaliatory] attitude was more likely than not a motivating factor in the [defendant's] decision[;]" and (2) "the evidence must be connected to the decision being challenged by the plaintiff." *Id.* Generally, "[w]e have referred to these requirements as creating a high hurdle for plaintiffs." *Id.* (internal quotation marks and citation omitted).

In addition, we have stated that certain circumstantial evidence "can fairly be said to directly reflect the alleged unlawful basis for the adverse employment decision."

*Fakete*, 308 F.3d at 339 (internal quotation marks and citation omitted)  For example, statements that "are not made at the same time as the adverse employment decision" can constitute direct evidence if the statements come from "a person involved in the decisionmaking process [and] reflect a discriminatory or retaliatory animus of the type complained of in the suit." *Id.* (internal quotation marks and citation omitted).  However, we have also stated that "any statements made by a defendant's employees must be made at a time proximate to the challenged decision and by a person closely linked to that decision." *Anderson*, 621 F.3d at 269 (citation omitted).

Here, Appellant argues that Dr. O'Mullane's email reflects unlawful bias that formed the basis of the four aforementioned adverse employment actions: (1) the negative performance review in 2015; (2) the decision to pass over her for Rx-to-OTC Switch Science position; (3) the decision to eliminate her role; and (4) the failure to provide her a new role after hers was eliminated.  Specifically, she contends that Dr. O'Mullane's email "clearly express[ed] his displeasure with [her] for complaining, in writing, about his discriminatory conduct," Appellant Br. at 19, and that Dr. O'Mullane "link[ed] her decision to complain about discrimination to what he perceived to be a failure in leadership." *Id.* at 19–20.  We reject these arguments.

Dr. O'Mullane's email cannot "fairly be said to directly reflect the alleged unlawful basis for the adverse employment decision." *Fakete*, 308 F.3d at 339.  As Appellant concedes, the email is ambiguous. *See* Appellant Br. at 30 ("[T]here are, at a minimum, other *possible* interpretations of O'Mullane's May 10, 2015 e-mail").  Indeed, it could be said to reflect either an objection to the approach Appellant took in raising her

9

concerns or to her complaint itself. Such ambiguous statements cannot be used to establish direct evidence of retaliation. *See Anderson*, 621 F.3d at 269 (concluding an ambiguous phrase could not be used to demonstrate direct evidence of discrimination). Therefore, we must analyze Appellant's claims under the *McDonnell Douglas* burden-shifting framework.

## B. Circumstantial Evidence

Under the *McDonnell Douglas* burden shifting framework, a plaintiff must first establish a *prima facie* case of retaliation. *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006), as amended (Sept. 13, 2006). To do so, the plaintiff must establish that: (1) she engaged in protected activity; "(2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Id.* (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). If the plaintiff establishes a *prima facie* case of retaliation, the burden then shifts to the defendant-employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 152 (3d Cir. 2017). If the defendant employer does so, "[t]he burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for [retaliation]." *Id.*

Even assuming Appellant established a *prima facie* case of retaliation, which we do not, her claim fails because she failed to establish that Bayer's reasoning for its adverse employment actions was pretextual. As a preliminary matter, the Court may

10

address pretext. "[A]lthough the District Court did not address [this issue], we can affirm based on any grounds supported by the record." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282 (3d Cir. 2012) (citing *Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd. Of Educ.*, 587 F.3d 176, 184 (3d Cir. 2009)).

To establish pretext a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve the employer's articulated legitimate reasons." *Lichtenstein*, 691 F.3d at 309–10 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Put differently, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* (quoting *Fuentes*, 32 F.3d at 765). A plaintiff must also demonstrate that "the exercise of a protected right was a determinative factor and therefore had a determinative effect on the [adverse employment action] such that in the absence of the . . . protected conduct, the adverse employment action would not have occurred." *Egan v. Del. River Port Auth.*, 851 F.3d 263, 268 n.1 (3d Cir. 2017) (citing *Miller v. CIGNA Corp.*, 47 F.3d 586, 597 (3d Cir. 1995) (en banc)). We will address each of the four adverse employment actions Appellant alleges, which

11

are also the ones the District Court found, to determine whether Appellees' proffered reason for such actions was pretextual.[2]

### 1. Negative Performance Review

Appellees assert that Dr. O'Mullane provided legitimate reasons for Appellant's Partially Meets Expectations rating under the Leadership sub-category in her 2015 performance review. Though Appellees do not elaborate on what these reasons were, presumably they are referring to Dr. O'Mullane's comments explaining that Dr. Laurora "lead[s] from the front," and that such an approach "does not always work to her advantage." JA783. Appellees further point to Appellant's response to these comments, indicating that she appreciated the feedback and would incorporate it, as evidence that she agreed with Dr. O'Mullane's assessment.

Appellant responds by highlighting the fact that prior to her complaint, no one at Bayer had expressed concerns about her leadership. As the District Court concluded, she also contends that she did not concede that her leadership needed improvement.

Appellant has not met her burden to establish pretext. The fact that Appellant did not receive negative comments concerning her leadership prior to raising her concerns about Dr. O'Mullane's statements does not cast sufficient doubt on his explanation for the rating. This conclusion is bolstered by the fact that the rating was for a new category in the performance review and it was Dr. O'Mullane's first formal review of Appellant.

---

[2] As discussed more fully below, Appellees offer various non-retaliatory reasons for each of the four adverse employment actions at issue in this case. Appellant does not dispute that Appellees satisfied their burden at step two of the *McDonnell Douglas* framework, so our inquiry will focus on pretext.

12

*See Couch v. Am. Bottling Co.*, 955 F.3d 1106, 1109 (8th Cir. 2020) (internal quotation marks and citation omitted) ("It was also [the supervisor's] first review of [the employee], so any potential inference of discrimination from the uncharacteristically negative review is weakened substantially by another rational explanation[:] . . . the shifting expectations of [a] different supervisor[ ]."); *Natofsky v. City of New York*, 921 F.3d 337, 351 (2d Cir. 2019) ("That a prior administration had praised [the employee's] work is not enough to establish that the new administration could not have concluded that he was underperforming.").

### 2. Rx-to-OTC Switch Science Role

Appellees explain that Bayer "made a business decision to merge the duties associated with [the Rx-to-OTC Switch Science] position with . . . an existing position on the Commercial side of the business." Appellees' Br. at 53 (citing JA777). Appellant argues that such reasoning is pretextual because Bayer only merged the position after allowing another employee, who lacked adequate qualifications, the opportunity to take on the role's responsibilities on an interim basis. Appellant further asserts that this approach demonstrates pretext because Appellant was qualified for the role yet was not given the same opportunity.

Appellant has not satisfied her burden on pretext. The employee who was given the responsibilities on an interim basis had already been serving in a switch science role at the time she was given the opportunity. Appellant has not argued or otherwise demonstrated that Bayer took an atypical approach in either providing such an employee with this opportunity or deciding to merge the Rx-to-OTC Switch Science role with an

13

existing switch science role. Thus, she has not demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the employer's] proffered legitimate reasons." *Lichtenstein*, 691 F.3d at 309–10 (citation omitted). She likewise has not shown that her complaint was the but for cause for Bayer denying her the role. *See Egan*, 851 F.3d at 269.

### 3. Elimination of Appellant's Role

Appellees state that the elimination of Appellant's role was due to strategic business objectives related to Bayer's restructuring. They further note that all of the Category Leader roles that were reporting to Dr. O'Mullane were eliminated. Appellant does not offer any retort to this reasoning. As such, this is further evidence of Appellant's inability to establish pretext under the *McDonnell Douglas* framework. *See Capps*, 847 F.3d at 152.

### 4. Failure to Find Appellant a New Role[3]

Appellees explain that Appellant was not offered the Head of Therapeutics role because that position was a full salary grade level higher than any of Appellant's previous roles and it had a broader scope of responsibilities. They also note that Bayer ultimately

---

[3] In addition to the Head of Therapeutics and Head of Innovation and Development Operations roles, Appellees also address two Development Center Lead positions. Since Appellant does not make any arguments concerning why Appellees' rationale for denying her these positions was pretextual, she has failed to meet her burden at step three of the *McDonnell Douglas* framework. *See Capps*, 847 F.3d at 152.

hired a candidate who, unlike Appellant, had a Ph.D and experience in research and development.

Appellant argues that Appellees' rationale "is contradicted by the record." Rply. at 23-24. She further contends that Appellees' rationale is pretextual because they provided "shifting rationales" for denying her the role. *Id.* At that time, she alleges Appellees' only rationale for the denial was her lack of leadership skills as evidenced by her negative rating. However, in this litigation Appellees assert that she lacked the requisite qualifications and experience. Appellant further argues that Appellees' articulated reasons for selecting another candidate constitute "an after-the-fact justification" because the candidate who received the role was hired approximately six months after Appellant was terminated.

Additionally, Appellees explain that the Head of Innovation and Development Operations role, which was located in Basel, Switzerland, was filled by a candidate who was more qualified and had more relevant work experience. They also note that this candidate was already located in Basel and thus, Bayer avoided paying relocation fees. Appellant argues that such reasons were pretextual because Bayer routinely permitted its employees to work remotely and travel to the office as necessary. She contends that Bayer's failure to do so in her case constitutes disparate treatment evincing pretext.

Appellant has failed to establish pretext concerning Bayer's rationale for denying her these positions. She has not demonstrated, for example, that she was more qualified than the employees who were ultimately hired for either of these roles. *See Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010) (internal quotation marks and citation omitted)

15

(the employee alleging retaliatory conduct "plainly lacked the stark superiority of credentials over [the employee that was hired] that can give rise to an inference of pretext."). She otherwise has not shown that Bayer's rationale for denying her these roles was weak, inconsistent or contradictory, *see Lichtenstein*, 691 F.3d at 309–10, or that her complaint was a but for cause of the denials, *see Egan*, 851 F.3d at 269. Indeed, qualifications, experience, and logistics are all appropriate considerations for employers to take into account while making hiring decisions.[4] Because Appellant failed to "prove, by a preponderance of the evidence, that the articulated reason[s were] a mere pretext for [retaliation]," *Capps*, 847 F.3d at 152, her retaliation claims against Appellees based on circumstantial evidence must also fail.

## IV.   CONCLUSION

For the foregoing reasons, we will affirm the District Court's order, granting summary judgment in favor of Appellees.

---

[4] While Appellant does not make this argument, it is worth noting that temporal proximity also supports our conclusions that she failed to establish pretext. We have previously held that "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive" to demonstrate pretext. *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014). The adverse events here occurred several months after her complaint.