PRECEDENTIAL

UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

_____

No. 20-1307
_____

JEFFREY KENGERSKI,

Appellant

v.

ORLANDO HARPER; COUNTY OF ALLEGHENY

_____

On Appeal from the United States
District Court for the Western District of Pennsylvania
(D.C. Civil Action No. 2-17-cv-01048)
District Judge: Honorable J. Nicholas Ranjan

_____


Argued on December 15, 2020


Before: AMBRO, BIBAS and ROTH, <u>Circuit Judges</u>


(Opinion filed July 29, 2021)

1

Margaret S. Coleman (Argued)
Law Offices of Timothy P. O'Brien
535 Smithfield Street
Suite 1025
Pittsburgh, PA 15222

Counsel for Appellant

Andrew F. Szefi
Virginia Spencer Scott (Argued)
Frances M. Liebenguth (Argued)
Allegheny County Law Department
300 Fort Pitt Commons
445 Fort Pitt Boulevard
Pittsburgh, PA 15219

Counsel for Appellee

Sharon Fast Gustafson
Jennifer S. Goldstein
Elizabeth E. Theran
James M. Tucker
Equal Employment Opportunity Commission
Office of General Counsel
131 M St. NE, Rm. 5NW10P
Washington, D.C. 20507

Eric. S. Dreiband
Alexander V. Maugeri
Katherine E. Lamm (Argued)
U.S. Department of Justice
Civil Rights Division
Appellate Section

Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403

Bonnie I. Robin-Vergeer
U.S. Department of Justice
Appellant Section
MJB 3718
950 Pennsylvania Avenue, N.W.
Washington, DC 20004

   Counsel for Amicus Appellant
   United States of America

Samuel J. Cordes
Rothman Gordon, P.C.
310 Grant Street
Third Floor, Grant Building
Pittsburgh, PA 15219

   Counsel for Amicus Appellants
   The Western Pennsylvania Employment
   Lawyers Association, National Employment
   Lawyers Association Eastern Pennsylvania

---

## OPINION OF THE COURT

---

AMBRO, Circuit Judge

  Jeffrey Kengerski, a Captain at the Allegheny County Jail, made a written complaint to the jail Warden alleging that

a colleague had called his biracial grand-niece a "monkey" and then sent him a series of text messages with racially offensive comments about his coworkers. Seven months later, Kengerski was fired. He contends the County fired him in retaliation for reporting his colleague's behavior and sued the County under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). The District Court granted the County's motion for summary judgment, holding that Kengerski, who is white, could not maintain a claim for Title VII retaliation.

We disagree. Title VII protects all employees from retaliation when they reasonably believe that behavior at their work violates the statute and they make a good-faith complaint. As relevant here, harassment against an employee because he associates with a person of another race, such as a family member, may violate Title VII by creating a hostile work environment. Because a reasonable person could believe that the Allegheny County Jail was a hostile work environment for Kengerski, we vacate the District Court's grant of summary judgment.

This does not mean that Kengerski will ultimately succeed on his retaliation claim, or even that it must survive summary judgment on remand. The County claims that it fired him for an unrelated reason that is unquestionably serious: mishandling a sexual harassment claim. We therefore remand to the District Court to consider whether Kengerski has sufficiently shown that he was fired because of his Title VII complaint.

## I. Background

In April 2015, Kengerski submitted a written complaint to Orlando Harper, Warden of the Allegheny County Jail. This complaint was against Robyn McCall, a white female employee at the jail who had been promoted to Major in December 2014. In his complaint, Kengerski detailed an event from over a year before (early in 2014) where he was discussing his grand-niece Jaylynn in the presence of then-Captain McCall and other officers. Kengerski told them he was preparing for the possibility he and his wife would take Jaylynn under their care because her mother was unable to maintain her parental responsibilities. McCall then purportedly interjected: "[W]hat kind of name is Jaylynn? Is she black?" J.A. at 236. After learning that Jaylynn was biracial, McCall allegedly responded that Kengerski "will be that guy in the store with a little monkey on his hip like Sam Pastor [another jail employee with a biracial child]." *Id.* Kengerski "asked her not to speak like that about [his] situation" and then left the room. *Id.*

Kengerski's complaint also mentioned and attached racially offensive text messages that McCall sent to him.[1] The District Court reviewed these messages and concluded that

> [t]hey were sent between February and June
> 2014 and depict unflattering photographs of

---

[1] The parties at times suggest that these text messages may have been sent in a group chat that involved Kengerski, McCall, and others, though they do so only by reference to each others' briefs and without record citation. The District Court did not make a finding of fact on this issue. Whether

> African-Americans and Asians, often repeating offensive stereotypes. For instance, several of the photographs depict overweight African-American women, and one of the photographs depicts an Asian woman with enlarged teeth. Some of the photographs have captions comparing them to African-American and Asian employees at the jail.

*Kengerski v. Allegheny Cnty.*, 435 F. Supp. 3d 671, 674 (W.D. Pa. 2020). After reporting McCall's comment and text messages, Kengerski's complaint asserts that he has "been harassed" and "feel[s] [he is] in a hostile environment and will be disciplined, harassed and possibly ridiculed by Major McCall on any occasion." J.A. at 236. Kengerski then concluded his complaint by detailing other managerial (but not explicitly racial) harassment he alleges suffering caused by McCall, including punitive assignment to the overnight shift.

The Warden subsequently referred Kengerski's complaint to the County law department. McCall was placed on administrative leave in May 2015 and resigned three months later. Kengerski claims that McCall was forced to resign because of his complaint. Following McCall's resignation, Kengerski reported several events he considered "retaliation" from other officers. J.A. at 394.

In November 2015, seven months after his complaint and three months after McCall's resignation, the County terminated Kengerski. It claims this was after he mishandled

---

these texts were sent in a group chat or directly to Kengerski alone would not alter our conclusion in this case.

6

a sexual harassment complaint, including allegations that he told two subordinate officers to lie on their reports during the investigation. In this connection, the County asserts that Warden Harper stated Kengerski's conduct was "more egregious than anything [the Warden had] seen . . . [i]n [his] 27 years of being a correctional professional." J.A. at 959. Kengerski challenges this reason as "pretextual," as the true motivation was retribution for reporting McCall and causing her resignation. J.A. at 1210.

In June 2017, the Equal Opportunity Employment Commission (EEOC) closed an investigation into Kengerski's termination and issued a right-to-sue letter. Kengerski filed suit two months later against Warden Harper and the jail. The initial complaint included claims for violation of due process, race and sex discrimination, and retaliation. An amended complaint filed in February 2018 continued to focus on race discrimination and associated retaliation under state, federal, and constitutional law, and also alleged retaliation for Family and Medical Leave Act complaints. After amendments to the pleadings and rulings on subsequent motions, the only remaining claim was Title VII retaliation against the County. *Kengerski*, 435 F. Supp. 3d at 675. The District Court granted the County's motion for summary judgment, holding that

Kengerski's retaliation claim failed as a matter of law. *Id.* at 674. He appeals to us.

## II. Discussion[2]

Title VII makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). To survive summary judgment on a retaliation claim, a plaintiff must first make out a *prima facie* case. *Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006).[3] This means that he must: "tender evidence that: '(1) []he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.'" *Id.* at 340-41 (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

---

[2] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. The District Court had separate grounds for jurisdiction over a variety of other claims in the initial complaint. Kengerski only appeals the dismissal of his Title VII retaliation claim.

[3] Under the *McDonnell Douglas* burden-shifting framework, after a plaintiff makes out a *prima facie* case, the burden of production shifts to the employer to provide a legitimate, non-retaliatory reason for its action against the plaintiff, and then the plaintiff may prevail at summary judgment only if he has evidence that the employer's response is merely a pretext. *Moore*, 461 F.3d at 342; *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Here, Kengerski contends that he meets all three elements for a *prima facie* case because (1) his complaint about McCall was protected conduct, and (2) he was fired (3) because of his complaint. Our review on appeal is plenary, which means we review each element anew. *Id.* at 340. We conclude that the District Court erred in granting summary judgment against Kengerski solely on the first element of the *prima facie* case. We need not address the second element, as the County concedes it is satisfied by Kengerski's termination. And because the District Court has yet to decide the third element, on remand it may consider causation in the first instance.

## A. Kengerski Survives Summary Judgment on the First Element of His *Prima Facie* Case Because a Reasonable Person Could Believe McCall's Behavior Violated Title VII.

To satisfy the first element of his *prima facie* case, Kengerski must show that he held "an objectively reasonable belief, in good faith, that the activity [he opposed] is unlawful under Title VII." *Moore*, 461 F.3d at 341. Kengerski opposed McCall's behavior by sending a written letter to the jail's warden that said he "would like to make a complaint about Major McCall with regards to harassment and inappropriate racial text messages." App. at 236.[4] The question we ask is

---

[4] We are not persuaded by the County's argument that Kengerski did not sufficiently "oppose" McCall's racial comments because his letter was ambiguous or contained references to McCall's managerial failings unrelated to racial discrimination. We have resoundingly rejected arguments that additional non-discrimination claims in a complaint can "obscure" our analysis of Title VII issues. *Moore*, 461 F.3d at 343 n.4.

therefore a simple one: Could a reasonable person, standing in Kengerski's shoes, have believed McCall's behavior violated Title VII?[5]

Workplace behavior may violate Title VII in a variety of ways. As relevant here, the Title may be violated when an employee's racist behavior creates a hostile work environment for his colleagues.[6] Still, we must be careful to distinguish between a hostile-work-environment claim (which Kengerski is not bringing) and his retaliation claim. To succeed on the former, a plaintiff needs to show that the environment was actually hostile, *i.e.*, that the offensive conduct at work was either "severe" or "pervasive." *See Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). But for a retaliation claim a plaintiff need not show that his working environment in hindsight was actually hostile, only that he held an objectively reasonable belief that it was. The difference between these two

---

[5] We leave out good faith here, as the District Court did not discuss that aspect of the first element, and the County does not meaningfully contest it on appeal. We take no position on this issue.

[6] Kengerski argues that he was opposing, in addition to McCall's behavior toward him, McCall's behavior directed at his coworkers of other races. In general, white plaintiffs are protected from retaliation when they blow the whistle on conduct "they reasonably perceived . . . as violative of Title VII" because it was hostile for their black coworkers. *Moore*, 461 F.3d at 342. But because Kengerski's reasonable belief that his own work environment was hostile satisfies the first element of his *prima facie* case, we need not consider whether his letter also sufficiently opposed a hostile work environment for his coworkers.

standards reflects a part of Title VII's purpose to "encourage employees to report harassing conduct before it becomes severe or pervasive." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (explaining that the standard for an adverse employment action differs between retaliation claims and other discrimination claims because "differences in the purpose of the two provisions . . . justify this difference of interpretation").

Still, a retaliation claim must be tied to Title VII. An employee must have complained about the type of conduct that is generally protected by that Title, such as discrimination on the basis of race. This includes discrimination because of an employee's association with a person of another race (such as a family member). But a complaint about workplace behavior that is so minor and isolated that it could not "remotely be considered 'extremely serious'"—that is not within some striking distance of an actual hostile work environment—is not protected because "[n]o reasonable person could have believed that [it] . . . violated Title VII's standard." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam). Here, viewing McCall's comment and her text messages together, we conclude that a reasonable person could have believed the jail was a hostile work environment for Kengerski, and thus violated Title VII.

>    1. *Employees Are Protected from Retaliation When They Reasonably Believe Their Work Environment Is Hostile Because of Their Association with Others.*

Amici (the United States and two Pennsylvania-based affiliates of the National Employment Lawyers Association) ask us to hold that an employee may be protected from

11

retaliation when he reports a work environment that he reasonably believes is hostile *to him* because of his association with persons of another race. We ordinarily would not consider this argument, which was not raised explicitly by Kengerski in his opening brief, because an "amicus may not frame the issues for appeal." *DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 731 (3d Cir. 1995) (quoting *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993)). Nonetheless, we are convinced that "substantial public interests" justify departing from this general rule because this issue could affect the behavior of countless employers and employees in situations ranging from interracial marriage to intra-office friendships. *Id.* Nor do we believe that the County will be "unduly prejudiced" by our consideration of this argument, which permeates the record in this case. County's Br. at 16 n.8, 39. The District Court considered and discussed the theory at length in its opinion, Kengerski's opening brief raised the general substance, if not the form, of the issue by emphasizing the comments McCall made to him based on his association with his biracial grand-niece, and his reply brief "raise[d] the issue by reference to the amicus brief." *Tyler v. City of Manhattan*, 118 F.3d 1400, 1404 (10th Cir. 1997); *see* Kengerski Reply Br. at 18. The County could—and indeed did—argue in its response brief against the associational discrimination arguments made by Amici. Thus it was not prejudiced procedurally. *See United States v. Boggi*, 74 F.3d 470, 478 (3d Cir. 1996) (deviating from the general rule that an argument may not be raised for the first time in a reply brief where the other party "has had an opportunity to respond to the arguments raised in [the] reply brief . . . [, and the] argument raises a question which we feel requires clarification in this circuit").

On the merits, we agree with our sister circuits that associational discrimination is well grounded in the text of Title VII.  In a practical sense, the name is a misnomer because, when you discriminate against an employee because of his association with someone of a different race, you are in effect discriminating against him "because of [his own] race" in violation of Title VII.  42 U.S.C. § 2000e-2(a)(1).  *See, e.g.*, *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (concluding that "where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's own race"); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999) ("A white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for the discrimination is a prejudice against the biracial child."); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 589 (5th Cir. 1998) (concluding that "a reasonable juror could find that Deffenbaugh was discriminated against because of her race (white), if that discrimination was premised on the fact that she, a white person, had a relationship with a black person"), *vacated in part on other grounds*, 182 F.3d 333 (5th Cir. 1999); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) (concluding that "[w]here a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of his race," and noting favorably that "the EEOC, which Congress charged with interpreting, administering, and enforcing Title VII, has consistently held that an employer who takes adverse action against an employee or a potential employee because of an interracial association violates Title VII") (emphasis omitted).

This theory of discrimination is not limited to close or substantial relationships. While "one might expect the degree of an association to correlate with the likelihood of severe or pervasive discrimination on the basis of that association," the "degree of association is irrelevant" to whether a plaintiff "is eligible for the protections of Title VII in the first place." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th Cir. 2009); *accord Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 884 (7th Cir. 1998). Employees thus may not be discriminated against because of their interracial relationships with distant relatives such as a grand-niece.

### 2. A Reasonable Person Could Believe That the Jail Was a Hostile Work Environment for Kengerski.

Here, McCall's behavior was clear and consistent: she expressed racial animosity toward jail employees who either were black or associated with black persons, such as Sam Pastor (who raised a biracial child) and Kengerski (who was considering taking in his biracial grand-niece). Therefore, we simply ask whether the totality of McCall's conduct is serious enough that a reasonable person could conclude that Kengerski's work environment was hostile.

We first pause to make an important clarification about McCall's standing in the jail at the time of the relevant conduct. The parties—including Kengerski—state that at the time of McCall's comments she had not yet been promoted to Major, seemingly implying that at the time of this conduct she was Kengerski's coworker. But reading the record in the light most favorable to Kengerski compels a conclusion that McCall was Kengerski's superior at the jail at the time of her offensive conduct, because McCall was a Captain and Kengerski was a

14

Sergeant. *See* J.A. at 83 (a County personnel file showing an effective date of Kengerski's promotion from Sergeant to Captain in September 2014); *id.* at 289 (the County's statement of facts acknowledging that "Kengerski was promoted from the position of sergeant to the position of captain on September 24, 2014"); *id.* at 236 (Kengerski's complaint alleging the comment made by "Captain McCall" occurred "over a year" before April 2015 and in any case prior to the text messages); *Kengerski*, 435 F. Supp. 3d at 674 (finding that the relevant text messages were sent between February and June 2014). The County itself acknowledges this distinction in rank is significant: "[S]ergeants and corrections officers [a]re subordinate to [captains]," who are "part of management." County's Br. at 4; *see also* J.A. at 290 (the County's statement of facts acknowledging that "sergeants are . . . not a part of management," but "Captains and above are part of the Jail's management team"). This dispels framing this case as involving harassment by a mere coworker.[7]

While the County incredibly attempts to argue that the comment about Kengerski's grand-niece (and another jail employee's child) being monkeys was merely a harmless "zoomorphism," it is clear that this term was used in a racist manner. County's Br. at 17; s*ee Kengerski*, 435 F. Supp. 3d at 679 (finding that this comment was an "offhand, yet offensive, remark"). As the Fourth Circuit has recognized, "describing an African-American as a 'monkey' . . . goes far beyond the merely unflattering; it is degrading and humiliating in the

---

[7] We express no opinion on whether or the extent to which we would analyze the reasonableness of Kengerski's complaint differently if the comment came from a coworker of equal rank.

extreme." *Boyer-Liberto*, 786 F.3d at 280 (citation omitted). Indeed, that Court reasoned that the term "porch monkey" was "about as odious" as the use of the "n-word." *Id.* Consequently, it concluded that even two uses of that term, viewed as a single incident of harassment, could be found by a reasonable jury to be "severe enough to engender a hostile work environment." *Id.* When faced with a single use of a racial epithet by a supervisor, we rejected the District Court's conclusion that "it was unreasonable for Plaintiffs to believe that a single incident of a discriminatory remark . . . could amount to unlawful activity." *Castleberry*, 863 F.3d at 267; *accord Rite Way*, 819 F.3d at 243 ("[Retaliation] claims grounded in isolated comments are not always doomed to summary judgment.").

Still, we need not decide whether this isolated comment, standing alone, is enough to support a reasonable belief of a Title VII violation because McCall subsequently made numerous additional racist comments in text messages over a period of several months. Though these comments did not directly refer to Kengerski or his grand-niece, the texts started coming "[n]ot long after" Kengerski stood up to McCall for making a racist comment about his grand-niece. Kengerski thus could reasonably believe that McCall's texts—particularly those with racist innuendos about black persons—were at least in part directed at him. J.A. at 236; *see generally Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) ("In addressing a motion for summary judgment, the facts must be viewed in the light most favorable to [the non-moving party], and []he is entitled to every reasonable inference that can be drawn from the record."). At a minimum, the comments made about other jail employees, at least some of whom Kengerski alleges were also McCall's subordinates,

16

could have bolstered Kengerski's reasonable belief that McCall's conduct toward him was grounded in racial animosity and created a hostile work environment. *See Caver v. City of Trenton*, 420 F.3d 243, 263–64 (3d Cir. 2005) (although a hostile-work-environment claim may not be maintained "solely by pointing to comments that were directed at other individuals," "evidence of those comments may be considered in determining whether facially neutral conduct . . . was actually based on [the plaintiff's] race"); *Moore*, 461 F.3d at 345 n.6 (explaining that "racial epithets of which the targets were not aware may well form the basis for a reasonable belief that discrimination has occurred or was occurring").

We express no view whether McCall's conduct would support a hostile-work-environment claim if Kengerski were to bring one. But employees "are not required to collect enough evidence of discrimination to put the discrimination case before a jury before they blow the whistle." *Moore*, 461 F.3d at 345. And we will not saddle the reasonable employee with all of the doctrinal twists and turns that a civil rights lawyer would need to navigate. *See E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 242 (5th Cir. 2016) (asking whether "an employee . . . not instructed on Title VII law[,] as a jury would be, [could] reasonably believe that she was providing information about a Title VII violation"); *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 290 (4th Cir. 2015) (en banc) (Wilkinson, J., concurring in part and dissenting in part) ("An employee is not an expert in hostile work environment law."); *Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981) (holding that "a layperson should not be burdened with the 'sometimes impossible task' of correctly anticipating how a given court will interpret a particular statute"). McCall's conduct was serious enough that a

reasonable employee in Kengerski's shoes could have believed his work environment was hostile.[8]  We thus vacate the District Court's grant of summary judgment relying solely on the first element needed for a *prima facie* case.

### B. The District Court Should Address Causation in the First Instance.

The County asks us to affirm the grant of summary judgment on the alternate ground that Kengerski has not shown a *prima facie* case of causation, the third element of a retaliation claim.  The District Court discussed causation only in a footnote, noting that

> [b]ecause the Court finds that Mr. Kengerski cannot demonstrate protected activity, it need not address the issue of causation. That said, there was a seven-month gap between the complaint and termination. Usually, courts will dismiss retaliation claims as a matter of law where there

---

[8] In light of this conclusion, we need not consider whether Kengerski's claim may stand solely on the ground that the Warden perceived him as having engaged in protected activity. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 571 (3d Cir. 2002).  Nor need we decide whether a plaintiff may maintain a claim simply because he "reasonably believes that a hostile work environment is in progress." *Boyer-Liberto*, 786 F.3d at 284; *see also* EEOC Enforcement Guidance on Retaliation and Related Issues at II(A)(2)(c) (instructing that "it is protected opposition if the employee complains about offensive conduct that, if repeated often enough, would result in an actionable hostile work environment").

is such a long gap. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (holding five-month time period between complaint and first adverse action insufficient by itself to support inference of causation).

*Kengerski*, 435 F. Supp. 3d at 676 n.1. Because the District Court did not expressly rule on the causation issue, we "decline to consider [it,] . . . choosing instead to allow that court to consider [it] in the first instance." *Forestal Guarani S.A. v. Daros Int'l, Inc.*, 613 F.3d 395, 401 (3d Cir. 2010).[9] Of course,

---

[9] We express no view on whether Kengerski can present a *prima facie* case of causation on remand, though we note that the District Court's singular focus on temporal proximity does not necessarily answer whether he has provided "sufficient [evidence] to raise the inference that [his] protected activity was the *likely reason* for the adverse [employment] action." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (emphasis in original) (quotation and citation omitted). While a very long delay may "suggest[], by itself, no causality at all," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (per curiam) (internal citations omitted), "[i]n the absence of . . . temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the

even if Kengerski establishes a *prima facie* case of retaliation, his claim does not necessarily survive summary judgment, as the Court may then determine whether the County's reason for Kengerski's firing (mishandling a sexual harassment claim) is legitimate or pretextual. *See Moore,* 461 F.3d at 342; *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021).[10]

\*     \*     \*     \*     \*

The crux of a retaliation claim is reasonableness: employees are protected from retaliation whenever they make good-faith complaints about conduct in their workplace they reasonably believe violates Title VII. Here, a reasonable employee could believe that McCall created a hostile work environment, in violation of Title VII, by calling Kengerski's biracial relative a "monkey" and then sending Kengerski a series of text messages with offensive racial stereotypes. We therefore remand to the District Court to consider whether the County fired him because of his complaint.

---

employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action," *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015).

[10] We deny the County's motion to strike these portions of Kengerski's reply brief as well as its request to strike discussion of associational discrimination.